## Newhouse *vs.* Godwin and Randolph.

When one of the subscribing witnesses to a will swears positively that the will was executed with all the requisite formalities, this is sufficient; and his testimony will not be overthrown, or balanced, by the non-recollection of the other subscribing witness.

Mere feebleness of intellect, however considerable, in a testator, will not invalidate a will.

The reason for sustaining the wills of excessively weak persons is, that the weak have the same rights with the prudent or strong minded to dispose of their property; and that if imbecility, and not a total absence or rather perversion of mind, should constitute inability to act, it would be impossible to draw any clear line of distinction, or one which should generally prevail. *Per* S. B. Strong, J.

Where a testator who had a wife and sister whom he left comparatively destitute, devised the bulk of his property to his *counsel*, whose influence over the testator was very great, and extended beyond professional matters, and the devisee drew the will, there being no evidence to show that it was in accordance with previous directions, or that any directions were given, or that the testator had previously designed to give any thing to him; and such devisee was present when the will was signed; and held the same, and gave the pen to the testator to make his mark, and asked him if it was his will, and whether he requested the witnesses to sign their names as such, and told the testator to repeat the words, who did so; and it was proved that the testator, in consequence of illness, was in a state of mind in which he readily yielded or assented to the suggestions of others; *Held*, that the will was invalid, as having been obtained by undue influence, and a decree of the surrogate, refusing to admit the same to probate, was affirmed.

Where a testator and a devisee under his will, by whom the same is drawn, stand in the confidential relation of client and counsel, that circumstance, alone, calls for great circumspection.

The mere fact that the mind of a testator has been influenced by the arguments or persuasions of the person principally benefited, however indec-

-rous, indelicate or improper they may be, will not, ordinarily, in the absence of fraud, vitiate a will.

Still *it must be the will of the testator*, however induced. If it be the will of another, to which the testator assented from mere habit, and that habit produced by prostration of both body and mind, it cannot be considered his will, and ought not to be sustained.

THIS was an appeal from a decree of the surrogate of the county of Kings, refusing probate of the will of William A. Godwin, deceased. The testator was a colored man, residing in Brooklyn many years, and died there, on the 6th of December, 1851, after an illness of two or three months. The instrument propounded as his will bore date the 18th day of November, 1851. The will was offered for probate before the surrogate of Kings county, by John Newhouse, the appellant, in behalf of himself and the other executors named in the will. The respondent, Mary Godwin, (now Mary Gale, she having re-married since the decision of the surrogate,) was the widow of the deceased; and the other respondent, Patience Randolph, was the sister of the deceased; and those persons were the only contestants before the surrogate. The surrogate, by his decree, refused to grant probate. The following opinion was delivered by him upon making that decree. It presents the material facts appearing from the testimony in the case.

*Jesse C. Smith,* SURROGATE. "William A. Godwin, the testator, a colored man, died on the 6th of December, 1851, at his house in Pearl-street, in the city of Brooklyn, possessed of some personal property and considerable real estate, amounting in the whole (as is said) to some $12,000 or $15,000. He left surviving him a widow, but no children nor descendants of children, and his sole heir at law is a sister, Patience Randolph, who resides in the city of New-York. The will offered for probate is dated November 18, 1851, and was made while the deceased was laboring under a disease of the brain and spinal marrow, which paralyzed his arms so that he could not write, and he was in bed at the time, in a sick and feeble state. The will is in the handwriting of John Newhouse, Esq., and is in substance as follows: After giving several small legacies, amount-

ing to $680, including $100 to his wife and $200 of his Irving Bank stock to Samuel J. Howard, an executor, the testator gives to John Newhouse the rest of his Irving Bank stock. He then devises all the rest and residue of his estate to his executors in trust, for and during the life of his wife, to apply the net income of the house and lot 193 Pearl-street, Brooklyn, (except so much as his wife is entitled to for her dower,) to the use of the Colored Home in New-York; to apply 10 per cent of the net income of the remainder of his estate, for and during the life of his wife, to the Colored Orphan Asylum in the city of New-York, and to apply the rest, residue and remainder of the income of all his estate, during the life of his wife, to the use and benefit of his friend John Newhouse and his children, and the survivor and survivors of them. After the decease of his wife, he gives the premises 193 Pearl-street to the Colored Home, and the rest, residue and remainder of all the trust estate, and all his property not otherwise disposed of in said will, after the decease of his wife, he gives to John Newhouse during his life, with remainder to his issue; and lastly, he appoints Abraham Frazee, of the city of New-York, builder, John Newhouse, of said city, counsellor at law, and Samuel J. Howard, of the city of Brooklyn, executors.

The statute of wills provides, that "all persons except idiots, persons of unsound minds, and infants, may devise their real estate by a last will and testament, duly executed according to the provisions of the statute." (2 *R. S.* 57, § 1.) And "every male person of the age of 18 years or upwards, and every female of the age of 16 years or upwards, of sound mind and memory, and no others, may give or bequeath his or her personal estate by will in writing." (2 *R. S.* 60, § 21.) The revised statutes (*p.* 63, § 40) provides, that "every last will and testament of real or personal property, or both, shall be executed and attested in the following manner: 1st. It shall be subscribed by the testator at the end of the will. 2d. Such subscription shall be made by the testator in the presence of each of the attesting witnesses, or shall be acknowledged by him to have been so made, to each of the attesting witnesses. 3d. The testator, at

Newhouse *v.* Godwin.

the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament. 4th. There shall be at least two attesting witnesses, each of whom shall sign his name as a witness at the end of the will, at the request of the testator. Before any will can be recorded as a will of real estate, or admitted to probate as a will of real or personal estate, it must appear, upon the proof taken, that such will was duly executed; that the testator, at the time of executing the same, was in all respects competent to devise real estate, and not under restraint; and the surrogate shall inquire particularly into the facts and circumstances, and shall be satisfied of the genuineness and validity of such will before admitting the same to probate, or granting letters testamentary, or of administration thereon."

[The surrogate, after stating the substance of the will, and citing the provisions of the revised statutes, says,] "From this summary of the statute regulations on this subject, there can be no doubt that it is incumbent upon every person who offers a will for probate as a will of real and personal estate, to show that the testator was of sound and disposing mind at the time of the execution; that he acted without restraint; that he knowingly subscribed the instrument offered for probate, in the presence of two witnesses, or acknowledged his signature to them; that he intelligently made known to the witnesses, at the time of execution, that the paper which he signed expressed his intentions in reference to the disposition of his estate, and the witnesses must sign their names in pursuance of a request emanating from the testator."

Three questions are presented in this case :

1st. Was the will of William A. Godwin executed in the manner prescribed by the statutes.

2d. Was he of sound mind and memory at the time when he executed the same; and

3d. Was his signature procured by fraud or undue influence.

The examination of the first question, necessarily to some extent, involves the second inquiry, for the reason that many of the presumptions which arise to sustain a will executed by

a man in the undoubted possession of all the faculties of his mind, cannot be invoked in a case where there is doubt as to the capacity of the testator. As for instance, the publication may be presumed, from a declaration made by a third party in the presence of the testator ; and a request to the witnesses to sign their names as such, may be implied from circumstances, showing that it was the desire of the testator that they should become subscribing witnesses, without any express request. But the presumption of a publication could not be drawn from a declaration made by a third party in the presence of the testator, unless it was entirely clear that the testator himself understood what the declarant said. Nor could a·request be implied from any circumstances attending the signing by the witnesses, unless it satisfactorily appeared that the testator understood, at the time, the necessity of having the witnesses sign, and desired the same to be done. .

The witness David C. Frazee, who is a clerk in the office of Mr. Newhouse, testifies that the testator signed his name by putting his mark at the end of the will, sitting up on the edge of the bed ; that such subscription was made in the presence of both witnesses ; and he says, that the testator not only replied in the affirmative to a question put to him by Mr. Newhouse, whether that was his last will and testament, but he repeated the words once after Mr. Newhouse, "I declare this to be my last will and testament ;" and the witness believes he used the word testament ; and he states also that both witnesses signed the will after the testator, and that before the witnesses signed their names, Mr. Newhouse asked the testator if he requested them to sign as witnesses, and he said, yes.

.The other subscribing witness, Nelson Morris, who is a grocer in the city of Brooklyn, says, that when he came in the room he asked Godwin how he did, and he said he was very feeble ; that Mr. Newhouse then asked this witness to sign the will, and he did so, and that after that they went up to the side of the bed, and Godwin made his mark, but that nothing was said by Godwin in his hearing, and that he cannot recollect that any thing was said by Mr. Newhouse while the witness was there, except

Newhouse *v.* Godwin.

that he requested him to sign as a witness. The testimony of Frazee is positive, while that of Morris is negative. The latter does not say that nothing was said by Godwin about the will, but that nothing was said in his hearing. If this were a case in which we had a right to presume a publication, and request to the witnesses, from the language used by Mr. Newhouse in the presence and hearing of the testator, I should have no hesitation in coming to the conclusion that the publication and request to both witnesses were made by the testator, though one of the witnesses is unable to swear to it. But if we admit that the testimony of the witness Frazee is uncontradicted, is there sufficient evidence in the testimony of the subscribing witnesses to satisfy a court or jury that the testator made known intelligently to them that the instrument offered for probate was his last will and testament, and that he wished them to subscribe their names as witnesses thereto? It is not sufficient that the testator answers yes to the inquiries whether that is his will, and whether he wishes the witnesses to attest it; nor is it sufficient that he repeats the formula, "I declare this to be my last will and testament, and I request you to sign as witnesses;" but he must hear and fully understand the purport of the inquiries put to him, and must be fully conscious of the objects and purposes of the solemn act which he is about to consummate. It will be said in answer to this view of the case, that the will was read to the testator, and that he knew the contents, and was satisfied with it, and therefore he declared it to be his will.

It is not very clear from the testimony that this will was read to the testator. The witness Frazee, in his direct examination, says he read it to the testator, sitting beside him in his chair. In his second cross-examination he corrects himself, and says that it was another will that he read to him in his chair. and that he read this to him lying in bed, about half an hour before it was executed. But when asked repeatedly if he is certain that this is the will he read to him the day that it was executed, he does not answer directly that it is, but it is his opinion that it is, and to the best of his knowledge it is; so that

the refusal to answer the question directly in a transaction of so recent origin, and the confusion of mind of the witness as to the time of reading the two papers, renders it at least doubtful whether this paper was ever read to the testator. If, however, he did read this will to the testator, it was not done at the time of the execution, and from the testimony as to the bodily health and the condition of mind of the testator at the time of the execution, I do not think we have a right to presume that he then understood the purport of Mr. Newhouse's request, or of his own alleged declaration, from the mere fact that the paper had been read to him half an hour before.

So much for the execution of the will. As to the proof of the soundness of mind of the testator, and of his competency to make a will, the statute, as before stated, imposes on the propounder the necessity of satisfying the court on this point. There is no direct testimony from either of the subscribing witnesses, or from any other person, that the testator was of sound mind at the time he executed the will. Morris, one of the subscribing witnesses, had no opportunity to test the condition of the mind of the testator, and does not speak of it. Frazee does not attempt to say any thing of the condition of his mind at the time of execution, and only says in reference to this subject, that when he read the will to him he appeared to understand it, that he stopped him once while reading it, and asked him to begin at the beginning, and said when he got through that he need not to have read it. Doctor Bennett says his disease was affection of the brain and spinal marrow, producing paralysis in the arms. He was sick two or three months. He (the doctor) was treating him for scrofulous tumors in the region of the breast when the disease of the spinal marrow developed itself. It was not sudden, like a stroke of appoplexy. The disease progressed not violently, but gradually. It kept growing upon him, and of necessity involving the condition of the mind more and more, so that on the 12th of November he was taken very ill, and sent for the witness on that day, on account of his being much worse. He found him very much reduced, heavy, partially comatose, in a profuse perspiration, and although he rallied

Newhouse *v.* Godwin.

partially from time to time, still this condition prevailed mostly all the way through the rest of his life, excepting an interchange of condition, in which he would give answers to questions with a foolish, shallow laugh, which was more remarkable, as he was usually sober, dignified and austere. The doctor attended him almost daily from November 12 to November 30: The will was executed on the 18th of November, and Godwin died on the 6th December, 1851. In reference to the condition in which the doctor describes the testator, I find in Ray's Medical Jurisprudence of Insanity, (a work highly complimented by sound Jurists,) at page 305, section 262, the following exposition: " In some affections of the head, and they may be primary or sympathetic, the patient lies in a comatose state, from which he may be aroused, when he will recognize persons and answer questions correctly respecting his feelings, but drop asleep again as soon as they cease to excite him." This is very much the condition in which the physician and the other witnesses, Thompson, Degruder and Hardenburgh found the testator at and about the time he executed the will, and for a week or ten days previous thereto, and down to the time of his death. This author, in the same section, says : " That the mind is much embarrassed certainly cannot be doubted, and it is well known that when the patient recovers he has ordinarily very little idea of what passed at these times ; indeed he is generally unconcious of every thing he either said or did. It would be a bold assertion to say that the mind under these circumstances is legally capable of making testamentary dispositions, and they ought, therefore, to receive no favor from the courts."

The propounder introduced two witnesses to whom the testator had declared, previous to his last sickness, that he intended to make a devise or legacy to the Colored Home, but there is nothing in their testimony which shows that the testator ever expressed his intention to give any thing by his will to the propounder, John Newhouse, or to any member of his family. As the leading and prominent feature of this will is to provide for Mr. Newhouse and his family, it seems to me that proof of the intention of the testator to make a small gift or devise to the

Colored Home, does not go far to sustain the instrument now offered for probate. On the other hand, testimony has been given, in opposition to the will, of declarations by the testator more recently made, that he intended to make his wife (who is scarcely allowed her dower interest in the real estate under this will) and his sister (who is entirely cut off thereby) the principal objects of his bounty. Independent, therefore, of the question of drawing up the will, the condition of the bodily health and state of mind of the testator, were such at the time of the execution of the will, that in the absence of any affirmative proof of soundness of mind, and of any directions of the testator for the getting up of this will, it will be difficult to say that there is evidence sufficient to satisfy the court that the testator was of sound mind and understood the purport of the instrument, which he executed, at the time he signed the same. But it is in evidence, undisputed, that this will was drawn by and is in the handwriting of John Newhouse, the propounder, who was the attorney and confidential adviser of the testator, and the will is made principally for the benefit of himself and family, to the exclusion of the widow and heir at law of the deceased.

The rules of law in relation to these cases, where a will offered for probate is in the handwriting of the person to be benefited by it, are well settled by the courts of England, of this state, and of almost all our sister states. *First.* That the *onus probandi* lies, in every case, upon the party propounding a will, and he must satisfy the conscience of the court that the instrument, so propounded, is the last will of a free and capable testator ; and *Second.* That if a party writes or prepares a will, under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased. (*Barry* v. *Butlin*, 1 *Curteis*, 637. *Jarman on Wills, last ed. p.* 40, *and notes. Crispell* v. *Dubois*, 4 *Barb.*

Newhouse v. Godwin.

*S. C. Rep.* 393. *Gerrish* v. *Nason,* 9 *Shep.* 438. *Patton* v. *Allison,* 7 *Humph.* 320. *Reall* v. *Mann,* 5 *Geo.* 456. *Hall* v. *Baye, Ala.* 687.)

Testing the will in question by these rules, I have not been able to remove from my mind the suspicion which the circumstances of this case have excited. The presumption which it is claimed by the propounder, is raised from the regularity of the will on its face, is rebutted by the circumstances attending the drawing and execution.

There is no evidence to show that the testator gave any directions for the drawing of the will; nor that he ever spoke of it before or after it was executed. There is no adequate reason shown to the court why the testator should have lavished upon Mr. Newhouse and his family so much of his property, to the exclusion of his widow and sister ; and in the absence of any such proof, though there may not be evidence sufficient to sustain a charge of fraud or undue influence, I am not satisfied that the instrument propounded is the last will of a free and capable testator.

I must, therefore, declare against the admission to probate of the paper, purporting to be the last will and testament of William A. Godwin, deceased, and decree that the costs of the surrogate, and of the widow and sister in contesting the will, be paid out of the estate."

*G. Clark,* for the appellant. I. The will is in all respects regular on its face ; it is subscribed by the testator at the end thereof; it has two attesting witnesses, who have subscribed their names to an attestation clause, stating that the testator, at the time of making such subscription in their presence, declared the same to be his last will and testament, and that they signed their names as such witnesses, at his request. This is a full compliance with the requisitions of the statute, and the presumption of law, therefore, is in favor of the due execution of the will. (*Doe* v. *Roe,* 2 *Barb. S. C. R.* 200. *Whitbeck* v. *Patterson,* 10 *Id.* 608. *Blake* v. *Knight,* 7 *Jurist,* 633. *Cooper* v. *Bochet, Id.* 681. *Id.* 754.) II. The due execution of the will

was also fully proved by the subscribing witnesses. (1.) By David Frazee, whose evidence is full and clear, and shows a complete execution. He proves that the will was read to the testator, that he understood it, approved of it, signed it, and requested the witnesses to sign it, and they did so ; and that he was of sound mind. The request to the witnesses by Mr. Newhouse, in the presence and hearing of the testator, was equivalent to a request by the testator himself. ( *Whitbeck* v. *Patterson*, 10 *Barb. S. C. R.* 608.) And as the testator signed and sealed it in the presence of witnesses who had been called to witness it, a request by the testator will be presumed. (*Butler* v. *Benson*, 1 *Barb. S. C. R.* 527.) And it being stated in the attestation clause, that the testator declared it to be his last will and testament, it will be presumed he did so, unless the witnesses recollect affirmatively that he did not so declare. (*Remsen* v. *Brinckerhoff*, 26 *Wend.* 325.) Moreover, the witness proves that Godwin did declare it to be his will, and the proof by one witness is sufficient. ( *Whitbeck* v. *Patterson*, 10 *Barb.* 608. *Jauncey* v. *Thorne*, 2 *Barb. Ch. R.* 40. *Nelson* v. *McGiffert*, 3 *Id.* 158. *Robertson* v. *Caw*, 3 *Barb. S. C. Rep.* 416.) And not only does this witness prove that the testator understood the will, but both witnesses, by the very act of signing their names *as* witnesses, solemnly testified to the sanity of the testator. (*Harrison* v. *Bowan*, 3 *Wash. C. C.* 565. *Whitenach* v. *Stryker*, 1 *Green*, 11. *Sloan* v. *Maxwell*, 2 *Id.* 573. 1 *Jarman on Wills*, 74, *note* 3.) (2.) So far as the other subscribing witness (Morris) fails to prove all the facts, or differs from Frazee, it is owing to a defect of memory, which is not permitted to defeat the due execution of a will. (2 *Barb. C. R.* 158.) *Jarman on Wills*, 220. (3.) Morris was evidently a prejudiced witness, and disposed so to shape his testimony as to make out a defective execution. He had advised the widow to contest the will; not on the ground of any alleged defective execution, but on account of the particular provisions contained in it, in respect to her. He is, therefore, not to be believed when contradicted by the other witness. The evidence of Frazee is, moreover, positive, while that of Morris is merely negative, and

Newhouse v. Godwin.

was so considered by the surrogate. (4.) Witnesses are not permitted to give evidence against their own attestation. (*Good-title* v. *Clayton*, 4 *Burr.* 2225. 1 *Jarman*, 74, *note* 3.) (5.) Morris' evidence, so far as it differs from Frazee's, is in *contradiction* to his own act and written declaration made at the time; for by the attestation clause he declares that the testator subscribed the will in the presence of the attesting witnesses, and that they subscribed *their* names as witnesses to such subscription at the request of the testator; whereas, Frazee's evidence is in *conformity* with his act and written declaration; and on that ground he is to be believed in preference to the other, according to the well settled rules of evidence. III. The executor or propounder, having thus proved the due execution of the will, and that all the requisites of the statute had been complied with, was entitled to probate (and the surrogate would have been compelled to grant probate) of the will, unless the contestants should impeach it by evidence on *their* part, and in this respect the *onus probandi* was thrown on them. (1 *Jarman on Wills*, 46. *Downey* v. *Murphy*, 1 *Dev. & Bat.* 82. *Shelford on Lunacy*, 325, 326.) (1.) The surrogate entirely erred in laying down the rule as to the *onus probandi*, and in supposing that the fact of the will being in the handwriting of the person benefited, shifted the burthen and cast it upon the propounder. He has taken the two rules laid down by him, *verbatim*, from the case of *Barry* v. *Butlin*, (1 *Curteis*, 637 : being the first of the cases cited by him;) and, on a careful examination of that case, it will be found that the surrogate wholly misapprehended it, and that it repudiates the very position he has assumed. (*See* 1 *Curteis*, 639, 640.) (2.) The contestants sought to impeach the will, on the ground of insanity or imbecility, fraud, and undue influence; and in all such cases the *onus probandi* lies on the party alleging those grounds of impeachment. (*Jackson* v. *Van Dusen*, 5 *John.* 144. *Whitenach* v. *Stryker*, 2 *Green's C. R.* 8. *Sloan.* v. *Maxwell*, *Id.* 568.) IV. The contestants entirely failed to prove any thing like insanity or *undsoundness of mind*, within the meaning of the law. All that the witnesses attempted to show was mere im-

becility ; but imbecility, if it had been proved, (which it was not,) is insufficient to avoid a will. (*Stewart* v. *Lispenard,* 26 *Wend.* 255. *Blanchard* v. *Nestle,* 3 *Denio,* 337. *Burger* v. *Sawyer,* 1 *Bradf. R.* 362. *Clark* v. *Sawyer,* 2 *Comst. R.* 448. *Shelford on Lunacy,* 37.) (1.) Even if the contestants had succeeded in showing imbecility, the surrogate is in error in saying that Godwin was not a *capable testator.* Imbecile persons are capable of making wills. (*See authorities above cited.*) (2.) All persons (in respect to condition of mind) are *capable testators,* except idiots, lunatics, and *persons of unsound mind.* (2 *R. S.* 56, § 1.) And the words, "unsound mind," are of the same signification with the words "*non compos mentis,*" and mean a total deprivation of sense. (*Blanchard* v. *Nestle,* 3 *Denio,* 37. *Stewart* v. *Lispenard,* 26 *Wend.* 299, 300. *Jackson* v. *King,* 4 *Cowen,* 207, 217. 2 *Madd.* 569. *Shelford on Lunacy,* 39.) (3.) There may be cases where imbecility of the testator, coupled with fraud on the part of the person benefited, will be sufficient to vitiate it ; but it is the *fraud* which produces this result ; and the surrogate having admitted that neither fraud nor undue influence had been proved, the conclusion he arrived at was palpably erroneous. Without fraud, the imbecility (if it had been proved) would not invalidate the will, nor warrant the position of the surrogate. When fraud or importunity, or undue influence are imputed, they must be proved. (4 *Hagg.* 485, 486. 1 *Curteis,* 648.) And the mere fact that the will is in the handwriting of the solicitor of the testator, or of the executor, or of the party benefited, is not sufficient of itself to raise the presumption of fraud. (4 *Hagg.* 485, 486. 1 *Curteis,* 649.) V. The surrogate not only erred as to the law bearing on the case, but he misconceived, and therefore misstated the facts. (1.) He says, that it is not very clear that *this* will was read to the testator. Frazee swears expressly that it *was* read to him; and although the counsel for the contestants, by a rigid cross-examination of an inexperienced witness, succeeded, perhaps, in producing some confusion when speaking of the two wills, yet the witness stated that both wills were read to the testator. (2.) Again, the surrogate says, "if

Newhouse v. Godwin.

the witness *did* read the will to the testator, it was not done at the time of the execution." The witness states that it was read to the testator at the same interview in which it was executed, and he thinks not more than twenty minutes before it was signed by the testator ; being at the same interview, on the same occasion, it is viewed as one transaction. (*Doe* v. *Roe*, 2 *Barb. S. C. R.* 200.) (3.) The surrogate states that there is no direct testimony from either of the subscribing witnesses, or from any other person, that the testator was of a sound mind at the time he executed the will. Frazee, after having stated that he read the will to the testator, that he appeared to understand it, and that he paid attention to the reading of it, expressly states, that although the testator was feeble in body, he was not laboring under any imbecility of mind ; " he was not imbecile at all ;" in other words, he was of sound mind. The testimony of Degruder also, and indeed all the evidence in the cause, shows he was of " sound mind," within the meaning of the law. (4.) Again, the surrogate states, that the propounder introduced two witnesses, to whom the testator had declared that he intended to make a devise to the Colored Home, &c.; but that on the other hand, testimony had been given in opposition to the will, of declarations by the testator, *more recently*, to make his wife and sister the principal objects of his bounty. The surrogate must here allude to the evidence of Demsey Kennedy, as he is the only witness who proves such declarations. The witness says this was in May, 1851; the declarations proved by the witness for the propounder were in July, 1851. Moreover, Kennedy, from his own account of himself, was unworthy of credit. VI. The surrogate rests his decision on suspicion merely, and says he was not satisfied of the due execution of the will by a free and *capable* testator. The suspicion was groundless, and the conclusions of the surrogate are directly opposed to the evidence in the case; and in the absence of restraint, fraud, or undue influence, his suspicion was no legal ground for refusing probate; he was legally *bound* to be satisfied. (*Wyatt* v. *Ingram*, 3 *Hagg.* 466. 4 *Burns, Ec. &c.* 70, *new ed. Constable & Bailey* v. *Tupnell & Mason*, 4 *Hagg.* 465, 477, 479.) If the testator

was in law *a capable testator*, if the will was duly executed, and if no fraud was proved, the surrogate had nothing to do with the reasonableness or unreasonableness of the provisions of the will, (*Greenwood* v. *Greenwood*, 3 *Curteis, Appendix*,) and was bound to admit it to probate ; and yet it is evident that the principal ground for his refusing it, was that no adequate reason had been shown for the particular provisions made.    VII. The provisions of the will are in conformity with previously expressed intentions of the testator as to several particulars, and not only show that it must have been drawn pursuant to his directions, but are strong evidence to rebut the supposition of mental incapacity.    (*Jarman on Wills*, 79.)    And, considering the particular situation of the testator's family, the disposition he made of his property, was in all respects proper and reasonable.    VIII. On the several grounds above stated, the decree of the surrogate was erroneous, and should be reversed, and he should be ordered to take probate of the will.

*W. H. Woodman* and *E. D. Culver*, for the respondents. The surrogate decided correctly, in refusing to admit to probate the paper propounded as the will of William A. Godwin.

I. *The will was not executed in the manner prescribed by the revised statutes, and is void.*    (1.)  Godwin did not declare it to be his last will and testament.    (2 *R. S.* 123, 2*d ed.*)   "Mr. Newhouse gave him the will to sign, and he signed it or made his mark.    Mr. Newhouse asked him, if that was his last will and testament.    Then he, Mr. Godwin, said yes.    Then Mr. Newhouse asked him * * * to this effect, ' you request these gentlemen to sign this as witnesses ?'   Mr. Godwin said ' yes.' Mr. Newhouse told him to repeat the words, ' I declare this to be my last will * *   Mr. Godwin repeated it after him.' Then we signed our names to it."   So says *one* witness, Frazee. Mr. Morris, the other witness, says, he has no recollection of any thing being said by Mr. Godwin ; "*I cannot call to mind there being a single syllable said about a will.*"   The will (so called) is dated November 18, 1851.   On the 13th and 18th February following, Mr. Morris endeavors in vain to recall any

such statement. (*Brinckerhoof* v. *Remsen,* 8 *Paige,* 488. *Rutherford* v. *Rutherford,* 1 *Denio,* 33. *Butler* v. *Benson,* 1 *Barb. S. C. Rep.* 526. *Doe* v. *Roe,* 2 *Id.* 200. *Chaffee* v. *Bap. Miss. Conv.,* 10 *Paige,* 85. 2 *Id.* 147.) (2.) The attesting witnesses did not sign the will at the request of the testator. Morris swears positively, that he signed his name as witness, at the request of Mr. Newhouse. He has no recollection that Godwin said any thing about it. The other witness says he heard some statements repeated after Mr. Newhouse. But the statute requires that there shall be "*two* attesting witnesses, EACH *of whom* shall sign at the request of the testator ;" not of the principal legatee. (3.) Morris did not hear him declare it to be his will. (4.) Godwin did not subscribe the will. His name is written to the will, but when or by whom, does not appear. It was not written at the time he made his mark. The making his mark might be a sufficient subscription, if he had requested some person to put his name to it. The mark would then be his manual adoption of the subscription. But the scrawl is nothing without the name ; and the name is nothing unless put there by his direction. (*Chaffee* v. *Baptist Miss. Conv.,* 10 *Paige,* 85, 91, 92.) II. Godwin was not of sound mind and memory when he executed the will. (*Scribner* v. *Crane,* 2 *Paige,* 147. *Crispell* v. *Dubois,* 4 *Barb.,* 393. *Ray's Med. Jurisprudence,* 305, § 262.) While it is true that the cases in this country and England, settle that mere weakness of intellect does not incapacitate necessarily, it is also true that in cases like this, of diseases of the brain, the impaired condition of the intellect, is almost always accompanied by a derangement. Congenital and long continued and permanent weakness, approaching to fatuity, is consistent with the absence of present disease. and is as distinct from the condition of the testator, as a shrivelled limb is from one swollen and inflamed by a fever sore. While many forms of insanity approach fatuity, they are not, for that reason, the less insanity. The testimony of the witnesses in this case, establishes not merely weakness of mind, but great derangement of intellect. The testator was a man of strong mind, se-

date, firm and somewhat austere. He exhibited an entirely different character under the influence of his disease. If the testimony shows any mental derangement, it is incumbent upon the propounder of the will to show that it was executed in a lucid interval. (*Clark* v. *Fisher*, 1 *Paige*, 174. *Jackson* v. *Van Dusen*, 5 *John.* 144.) Or even loss of the power of mind: (1 *Paige*, 174.) But farther : The cases which establish that mere mental weakness does not incapacitate, do so upon the principle that the "man of. mean understanding, though he incline to the foolish sort, is not prohibited to make a testament." So our statute, requiring in the testator " *a sound mind and ' memory,*" clearly requires the healthy exercise of *what faculties he has.* His mind, of whatever degree of strength or power it be, must be *sound.* A mind prostrated or deranged by disease is in no sense sound. No one would for a moment suppose that John Jacob Astor, prostrated by sudden disease to the fatuitous condition of Alice Lispenard, (26 *Wend.* 271,) could be " of sound mind and memory." (*Clark* v. *Fisher*, 1 *Paige*, 174, *and cases there cited.*) It was incumbent on the propounder to prove affirmatively that the testator was of *sound mind and memory.* (2 *Paige*, 147.) But it is not so material to urge this point ; as the evidence is abundant and overwhelming, even if Godwin had capacity enough to make *a* will, III. This instrument is not the last will and testament of William A. Godwin—is not his " *spontaneous intention.*" (1.) There are strong presumptions that this paper, to which his mark is made, was never read to him, and that he never heard or dreamed of its contents. Newhouse drew at least two wills for Godwin, within the knowledge of Frazee. The witness read a will to the testator—he thinks, this one ; he don't know as he has any doubt that it was this one—twenty minutes or half an hour before it was signed. *That will, so read, passed out of the hands of the witness before signing, and into the hands of Mr. Newhouse,* the party claiming under this instrument ; when, does not appear. Mr. Newhouse *might* have prepared another instrument intermediate. *The last sheet of this will does not belong to the others. It was drawn, finished with*

*the attestation clause entire, as a part of another will,* and has the proof of it upon its face. The conclusion of the attesting clause is as follows: "The words 'and fifty' interlined on the first line of the page." There is no such interlineation, and no place for any such words on the first page; but there must have been to that instrument to which this sheet originally belonged. Nay, more: Every word of "the paper" (except perhaps the codicil) was read to Godwin. And if he was of disposing mind and memory, he knew the purpose and effect of that interlineation. And yet no such interlineation *is* or *could be* in this instrument. (2.) The evidence is irresistible that fraud or imposition, or undue influence, was practiced upon Godwin to make him affix his mark to the paper in question. He was in a condition peculiarly liable to fraud, imposition or undue influence. He was reduced so near to total idiocy that his physician, from viewing his condition, "felt humiliated in view of what we might become reduced to by the workings of disease." And this is the more striking, as it is an impression upon the mind of *a physician;* one in the constant habit of watching the workings of disease, and therefore not so likely as another to be so impressed, unless the case is very striking and unusual. Newhouse *had* acquired great influence over him during his sickness. He had induced him to disregard the directions of his physician, and to use brandy which his physician had forbidden, and to continue its use, although it intoxicated him. In the last stages of his disease, when he would notice no one else, he answered readily when Mr. Newhouse spoke to him. But aside from these casual and incidental circumstances that show the power Newhouse had acquired over him, all the facts in the case are proof of it. The large gift to Newhouse, not merely to the exclusion of his wife and kindred, but of those objects of benevolence for which he had professed peculiar regard, where "it would do most good." This pretended will was drawn by John Newhouse, the person chiefly benefited by its provisions. This alone is strong evidence of fraud, (*Crispell* v. *Dubois,* 4 *Barb.* 393;) and the court should be satisfied by proof extrinsic the will, that the testator intended to make a disposition

of his property in accordance with it. No such proof was offered. (4 *Barb.* 393.) This presumption is strengthened by the fact that Newhouse held towards Godwin the confidential and influential relation of lawyer towards client, *and especially of white lawyer towards colored client;* and by the fact that this pretended will would operate to take his property away from his near relatives and give it to a stranger to his blood and race. (*Clark* v. *Fisher,* 1 *Paige,* 171.) Still further, by the fact that the provisions of this pretended will are in direct conflict with Godwin's intentions as expressed a short time before his death. And by the fact that Newhouse brought his clerk from New-York to witness the will, and that clerk, the son of an executor, whose name Newhouse inserted as such, although he was a stranger to Godwin, and excluded Godwin's wife from the room. Newhouse advised Godwin to use, and provided for his use, brandy, and persuaded him to drink it, and this against the express prohibition of his physician, and when its use tended directly to aggravate his disease. This is another evidence of fraud. The presence and officious interference and management of Newhouse at the execution of the will; and the fact that the person who signed Godwin's name to the paper did not sign his own as a subscribing witness, although, being a lawyer, he knew it was required by statute, also indicate fraud. This will, if his, impeaches the character for rectitude which all the witnesses give him. Newhouse, being a lawyer, knew that all the circumstances of suspicion are so regarded by the courts. He would not have incurred them without a reason so urgent as to approach to a necessity; and the only such reason that can be assigned is, the probability that Godwin, left to his own impulses, would either *make no will,* or one which would not give the property to Newhouse. No other hypothesis can account for the interference of a legatee, who was alien to the blood and race of the testator, who had no claims upon his remembrance. (*Stewart's Ex.* v. *Lispenard,* 26 *Wend.* 287, 8, 9.) There is no evidence that this pretended will was drawn by Godwin's directions, or that its provisions accorded

with any such directions. (*Stewart's Ex.* v. *Lispenard*, 26 *Wend.* 287, 8, *and the cases cited.*) The history of the instrument, as given by Frazee, if it is true, is inconsistent, and entirely irreconcilable with the notion that it was the spontaneous and intelligent act of Godwin. IV. The execution of the paper, the state of his mind, and the fraud and undue influence practiced, were all questions of *fact.* The surrogate saw the witnesses, heard their testimony, marked their appearance, and judged of their relative credibility. His finding as to the *facts* is conclusive. No court of review will reverse his decision. That finding is in accordance with the weight of the evidence, and in accordance with the law, the equity, and justice of the case, and should be affirmed. (*Clark* v. *Fisher*, 1 *Paige,* 171. *Colton* v. *Ross*, 2 *Paige*, 396.)

*By the Court*, S. B. STRONG, J. I am inclined to think that the requisite formalities to sustain the execution of the paper propounded as the will of the deceased, were sufficiently proved. Frazee, one of the subscribing witnesses, swears positively that they were adopted. Morris, the other subscribing witness, does not recollect hearing the testator declare that the paper to which he had made his mark was his last will and testament, or request any one to sign his name as a witness. But the non-recollection of this witness cannot overthrow, or balance, the affirmative and positive evidence of one who seems to have been more attentive, and to have a better memory. The statements of Frazee should undoubtedly be received with some hesitation, as he is a clerk of the principal beneficiary named in the will, and a son of one of the executors. These circumstances, however, are not sufficiently strong to destroy, or seriously impair, the credibility of the witness. In this case, too, the testimony is supported by the considerations that the person the most interested was present and an active participator in the transaction, and that he was a lawyer, and no doubt well acquainted with the provisions of the statute relative to the execution of wills, and could of course effectuate a full compliance with them.

There can be no doubt that the mind of the testator had been seriously weakened by his disease. That, according to the testimony of his attending physician, was an affection of the brain, and it eventually, and probably before the execution of the will, induced a softening of the brain. Doctor Bennett testified that six days before the date of the will he found the testator very much reduced, heavy, partially comatose, and in profuse perspiration. That " although he rallied partially, from time to time, still this condition prevailed mostly all the way through the rest of his life, excepting an interchange of condition, in which he would give answers to questions with a foolish, shallow laugh, which was more remarkable because it contrasted strongly with his natural sober, dignified, austere manner, which he had when in health." Another witness (Mr. Thompson) testified that he visited the testator nine and ten days before the date of the will; that he found him on both days in a state unfit for conversation; that he was in bed swooning or sleeping, drowsy and heavy. Mr. Hardenbergh, who resided in the rear of the house occupied by the testator, and was his tenant, testified that he saw the deceased frequently, and was with him two days before the date of the will, for about an hour; that he tried to have some conversation with the testator, but " could not understand what he would say," although he made an effort to converse with the witness. No direct evidence was introduced by the appellant to prove the sanity of the testator. His counsel, however, in an elaborate and ingenious written argument, infers such sanity from the statements of the witnesses introduced in opposition to the will; that the testator shortly before the execution of the will, and about the time when the transactions mentioned by them to prove his imbecility of intellect, occurred, requested that a particular chapter in the bible should be read, and himself repeated a psalm containing sentiments certainly very appropriate for one in his situation, and that at times he appeared to be engaged in prayer. These circumstances would seem to indicate a retention of intellect at least to some extent, although I have heard clergymen of great experience say, that they had never known an insane man, who had been a devout christian, that did not

Newhouse *v.* Godwin.

retain and express a lively recollection of his religion. The counsel also relies upon the request made by the testator, when the will was read to him shortly before its execution, that the reader who had commenced with that part containing the bequests and devises, should read from the beginning of that document. This certainly evinced consciousness in what was going on, and showed that the testator had and exercised, at the time, some power of perception. I should be unwilling to say, upon the testimony before the surrogate, that the testator had wholly lost his mind. If the case turned upon that question, I should feel inclined to send it to a jury. The cases certainly establish the rule that feebleness of intellect, however considerable, in the testator, shall not invalidate a will. By our laws, all persons, except idiots, persons of unsound mind, married women and infants, may devise their real estate ; and all persons of the requisite age, of sound mind and memory, and no others, may give and bequeath their personal estate, by will. That a person who from natural or acquired defects, possesses an intellect but the next degree above positive idiocy or lunacy, so low indeed that he can neither converse nor act with discretion, should be deemed of sound mind and memory, is at least singular, if not contradictory. I doubt much whether the principle has not been extended further than good policy requires. In the reported cases where wills have been avoided for imbecility of mind in the testator, I recollect many instances of gross injustice and hardship, but not one where a wise or appropriate decision had been made. It is true that wise men sometimes make foolish wills, but such cases are exceptions to, rather than according to, the general rule. The reason for sustaining the wills of excessively weak persons (and by those I mean persons of the lowest degree of mental capacity, where there is a glimmer rather than light,) is that the weak have the same rights with the prudent or strong minded to dispose of their property, and that if imbecility and not a total absence, or rather perversion, of mind should constitute inability to act, it would be impossible to draw any clear line of distinction, or one which should generally prevail. There is certainly much force in these reasons. At any

rate the rule has been thoroughly established and we must submit to it, whatever may be our opinion as to its necessity, propriety or expediency.

The only other question is, whether the will in question did not result from undue influence exerted upon the testator by the principal proposed donee. It appears from the evidence that the deceased had been, previous to his illness, a man of sound discretion and prudence, and great firmness. In these particulars his sickness created a marked change. Doctor Bennett says that he then "assented to propositions made;" "that he would assent at once, without reflection, and seemingly could be persuaded to almost any thing;" that "he seemed to have lost his ordinary force and character." There are circumstances to which I shall presently allude, which confirm the doctor's opinion as to the facility with which the testator, during his illness, yielded or assented to the suggestions of others.

The deceased does not appear to have been much attached to his wife or sister. But still it appears to have been his intention, while in health, and strong minded, to make them the principal recipients of his bounty. Two instances testify to his favorable intentions as to his wife; one in reference to his sister. He also stated his wish to give something to the Colored Home Society. But there is no evidence to show that he intended before his sickness, or during his illness, except from the will itself, to make any donation to the appellant or to his co-executor William J. Howard, to whom considerable legacies are given in the will.

The appellant and the testator stood in the confidential relation of counsel and client. That alone calls for great circumspection. (*Gibson* v. *Jeyes,* 6 *Vesey,* 266.) The influence which the appellant had over his client appears to have been very great, and extended beyond professional matters. Thus the appellant induced the testator to resort to a strong stimulant, contrary to the advice of his family physician. The testator permitted the appellant to draw his will, and told the appellant's clerk that he would have been satisfied without hearing it read. There could not well have been stronger instances of confidence

than these; one relating to a remedy for dangerous bodily infirmities, and the other to the disposition of the testator's entire estate.

The appellant drew the will. There is nothing to show that it was in accordance with previous directions, or that any directions were given. It is true that it was read to the testator, and that he must have assented to it. His assent does not however prove that it was his will, as the evidence shows that he readily assented to whatever was proposed to him. This peculiarity, coupled with the entire absence of any proof that the testator had previously designed to give any thing to the appellant, or that he had given him any instructions to draw the will, lead strongly to the inference that it was the will of the appellant and not of the testator. I concede that the mere fact that the mind of a testator has been influenced by the arguments or persuasions of the person principally benefited, however indecorous, indelicate or improper they may be, will not ordinarily, in the absence of fraud, vitiate a will. But then *it must be the will of the testator*, however induced. If it be the will of another, to which the testator assented from mere habit, and that habit produced, as in this case, by prostration of both body and mind, it cannot in any sense of the word be considered as his will, and ought not to be sustained. The will of John Fisher was set aside by the court of appeals for no other cause. (*Clarke* v. *Sawyer*, 2 *Comst.* 498.)

In this case the appellant not only drew the will but he sent his clerk to read it to the testator; he was himself present when it was signed, held the will, and gave the pen to the testator to make his mark; he asked the testator if it was his will, and whether he requested the witnesses to sign their names as such, and told the testator to repeat the words; and he did so. This last circumstance, according to *Swinburne*, is strongly against the presumption that it is the will of the supposed testator. (1 *Swin. on Wills*, 189.) There is nothing to show the propriety of this extraordinary agency; nor why the testator should prefer giving the bulk of his property to one of another race, rather than to the wife of his bosom and his near blood relative;

except his readiness to yield to the suggestions of others. It would be monstrous to sustain a will made under such circumstances.

The decree of the surrogate should be affirmed, with costs.

[KINGS GENERAL TERM, October 3, 1853. *Barculo, Brown* and *S. B. Strong,* Justices.]