Davies, J.
This is an appellate tribunal, and its ordinary duty is to review the decisions of the courts from which appeals lie to it, solely on questions of law. There is a class of cases, however, where it is incumbent oh us to review questions of fact, and the present cases are of that character. We are called upon, by the appeals taken therein, to affirm or reverse the decree of the surrogate of ¡New York, which on appeal has been affirmed by the Supreme Court of the first judicial district. By that decision the surrogate refused to admit to probate two codicils to the will of Henry Parish, deceased, alleged to have been made by him, one on the 15th of September, 1858, and the other on the 15th of June, 1854.
It appears that Mr. Parish, while in conceded health, in the full possession of all his faculties, and after much deliberation, frequent consultation and discussion with his counsel, on the-20th of September, 1842, made and executed his last will and testament. Although his attention seems to have been afterward, on several occasions, attracted to its provisions, and *17 although he must have been aware that the devise to his wife of two pieces of real estate in the city of New York (one of which was the dwelling-house occupied by them) had been rendered inoperative by the sale of them, and although he was equally conscious that his estate had been greatly augmented, and was constantly increasing by its annual accumulations, yet while in health he intentionally and deliberately declined to make any alteration in its provisions, and for nearly seven years, notwithstanding these and other changes, persistently adhered to it, as originally framed, and executed.
It is seldom that so much intelligent consideration, fixedness of purpose and adherence to conclusions, are evinced in the preparation and execution of a will.
On the 19th of July, 1849, Mr. Parish, while in the apparent enjoyment of full health, was struck with an attack of paralysis, described by the physician as hemiplegia.
Whether or not he had testamentary capacity after that period, has been the subject of the elaborate investigation, and the learned, able, and extended discussions in these cases;
At the time the will of 1842 was made, the testator had no child, and made no provision for any. He never had one. He estimated the total of his estate, real and personal, then to be $732,879. By this will, he gave to his wife $331,000, including the two pieces of real estate subsequently sold by him, and which he estimated at $23,000. To the relatives of his wife he gave specific legacies amounting to $95,000. At the time of his attack, although he had reduced the provision made for his wife, $23,000, by the sale of the two pieces of real estate mentioned, yet he had increased the value of the New Orleans real estate given to her, by an expenditure thereon amounting to $21,500, and by addition to his furniture, paintings, statuary, silver, &c., equal to about the sum of $25,000, all which, by the provisions of the will, were given to her. He had therefore kept good the amount secured to Mrs. Parish by the will, and had enhanced it in the manner indicated, so that on the 1st of July, 1849, it amounted, according to his estimate, to about the sum of $350,000.
*18 He thus, oh grave deliberation, gave to his wife and her relations nearly two-thirds of his whole estate as it then existed. By his will he also gave specific legacies- to various relatives of his own blood, and to personal friends, amounting in the aggregate to the sum of $270,000, and then gave the residue and remainder of his estate to his two only and surviving brothers, Daniel Parish and James Parish. The amount they would have taken, according to the testator’s estimate of his estate, at the date of his will, if it had then taken effect by his death (an event which it is apparent he did not then contemplate as likely soon to happen, being then 54-years of age, and in apparent good health) would be about the sum of $18,-000 to each, less than the amount of the legacies given to each of his sisters. The small sum given to his brothers, in comparison to the amount, given to others, and the language used in the will, as applicable to this residuary devise, are convincing evidence to our minds of the testator’s intention to give permanency to the disposition of his property then made by him, and of his expectation that this residue would ultimately secure to his brothers such an ample portion of his estate as would evince his affection for them, and satisfy them that their just and natural right to share in his estate had been fully recognized by him. His solicitude, in the first place, to make ample provision for his wife, is clearly apparent from the testimony of Mr. Havens. He was not only desirous of securing her such a portion of his estate as would enable her to maintain her established position in society, and supply to her all the wants and luxuries to which she had been accustomed, but he was also anxious that the provision should be so ample that a carping and fault-finding world should so esteem it. As already observed, by his will, he constituted his two brothers his residuary devisees, and declared (and such declaration controls this residuary clause) that he intends his will not only to apply to the property then owned by him, “ but to all that may be thereafter acquired, by purchase, descent, distri button, or otherwise ”
*19 At this time the testator’s income was about $60,000 annually, and his expenses were about $10,000 a year. Without any extraordinary expenses or outlays on his part, the testator must have been aware that his' estate would be augmented by its natural increase by about the sum of $50,000 annually, and this entirely independent of the additions by profitable investments, and other uses of his means, which it is apparent were employed by him to increase his wealth. The inventory of his estate made by him July 1,1849, shows it had increased in seven years, at the valuation he then put upon the various items of his property, about the sum of $200,000; and add thereto the expenditure on. the Union Place property over and above his estimate of its value, $52,000, and the actual increase was over $250,000. He was therefore well aware that, by the terms of his will, these augmentations of his estate would fall into the residuary clause, and go to his brothers. Their portion of his estate, he must have seen, would be munificent, and such as brothers in these circumstances would naturally expect from a wealthy brother, dying without issue, after making ample provision for his widow.
The testator witnessed this augmentation with full knowledge of -its destination, and with the certainty of its continuance and increase, for the period of seven years, without any intimation of a change of his purposes, or expressing any wish to divert it to different objects.
Such was the permanent character of the disposition made by the testator of his estate in full health, and such "his final and settled purpose in reference to it, down to the time of his attack in July, 1849. From thence till his death, in March, 1856, the wife of the deceased was hardly ever absent from his presence, and she and her relatives were his constant companions and attendants, to the exclusion almost wholly of his own relations, with whom up to this period, it would appear, he had always lived on terms of intimacy and cordiality.
Mr. Parish having recovered from the severity of his attack, a codicil was prepared at the suggestion of Mrs. Parish, for him to execute, and which, was executed on the 29th of *20 August, 1849, whereby the testator gave to his wife certain real estate, amounting in value to about the sum of $200,000 The learned counsel who drew this codicil at the request of the devisee, and superintended its execution, having, as he says, fears that others might have doubts of the testamentary capacity of the testator, recommended that it should be re-executed when his health and mind should have improved; and it being supposed that such improvement had taken place, it was accordingly re-executed on the 17th of December, 1849.
In September, 1853, Mrs. Parish and her brother having made an estimate of the estate of Mr. Parish as it then was, and valuing the same at $1,186,960, Mrs. Parish drew up instructions for the disposition of about $500,000" of personal property, and employed the same counsel who had drawn the codicil of 1849, to prepare another for Mr. Parish to execute, disposing of this amount of personal estate, all of which was to be given to Mrs. Parish, except the sum of $52,000 invested in stocks, to be given to certain charities. It was claimed by Mrs. Parish that nearly all of this property was then hers, by virtue of gifts from her husband since his attack, inter vivos, and the nominal title to which had been changed by her from his name into hers. This codicil was doubtless prepared in consequence of the suggestion of the counsel, that grave doubts were entertained of the validity of these gifts inter vivos. A codicil was accordingly prepared (incorporating into it the codicil of 1849), by which personal property amounting to $349,460 was given to Mrs. Parish, and $50,000 to be divided among certain enumerated charitable institutions. It also revoked the appointment of Daniel Parish as one of the executors of the will of 1842, and the legacy of $10,000 given to him by that will.
On the 15th of June, 1854, a third codicil was prepared by the same counsel at Mrs. Parish’s suggestion, and which was executed on that day, which revoked the residuary gift and devise in the will of 1842 to the brothers Daniel and James, and installed Mrs. Parish in their place as the devisee of the whole residue of his estate.
*21 It would seem from the testimony, if Mr. Parish’s signs and gestures were correctly interpreted, that it was his will, at the time of the re-execution of the codicil in December, 1849, to revoke and annul the specific legacies, amounting to the sum of $130,000, given by the original will to the children of his brothers Daniel and James; and it appears he was only deterred from insisting that.it should then be done, by the remark of the counsel, “ that he wished it might not then be done; that it would fatigue and disturb Mr. Parish; that it would require a great deal of deliberationand by the assurance given by the counsel, “ that he could come and do it at some other time.” At the time of the preparation and execution of the codicil of September, 1853, in the numerous interviews and consultations had in reference to it, it does not appear from the testimony that any suggestion was made by the counsel to Mr. or Mrs. Parish in reference to the revocation of these legacies, or that the subject was alluded to by either Mr. or Mrs. Parish At the time of the preparation of the codicil, of June, 1854, in an interview between Mrs. Parish and the counsel, in Mr. Parish’s presence, she again suggested that Mr. Parish wished to revoke these legacies, and the counsel understood Mr. Parish as so desiring; but on a suggestion of the counsel, that “ it w;ould be harsh to do so,” the subject was dropped.
It is apparent, if Mr. Parish had a wish on this subject, and it was correctly understood, it was not carried into effect by those around him, and wHo were alone competent, or had the power to impart vigor and give effect to his wishes. At any rate, their revocation was not incorporated into either of the codicils of December, 1849, or of June, 1854. It is therefore undeniable, that if these codicils expressed a portion of his wishes as to the disposition of his property, they failed to give expression to the whole of them, and that, as to this large sum of money, it took a direction, if Mr. Parish’s gestures and signs were correctly interpreted, contrary to his expressed and earnest intentions; and his acquiescence in the. suggestions made, if he did so acquiesce, shows conclusively the feebleness of his purposes, and his ready submission to the will of others.
*22 The surrogate of New York, after a.most protracted examination of witnesses, with the opportunity of hearing, and himself taking down their testimony, carefully weighing and arranging it as the investigation proceeded, scrutinizing each witness, and his manner on the stand, with the great advantage óf personally seeing the intelligence, candor, accuracy, and truthfulness of each; aided by the elaborate discussions and critical analysis of the facts by the able and distinguished counsel employed in the case—found and decided as matter of fact that the testator had not testamentary capacity on the 15th of September, 1853, or on the 15th of June, 1854, to make the two codicils of those dates respectively, and that they were not his will or any part thereof, and he refused to admit the same to probate. This decree has been affirmed by the general term of the Supreme Court, and from that decision, those claiming the codicils to be valid have appealed to this court.
Before proceeding to the examination of the facts in the present case, it may aid us in arriving at a correct conclusion to advert to a few rules of law, which it is deemed are well recognized and long established :
It is provided by the statute law of this state, that “ all persons, except idiots, persons of unsound mind, married women and infants, may devise their real estate, by a last will and testament,” duly executed, in accordance with the formalities prescribed by law (2 R. S., p. 57, § 1); and that “ every male person of the age of eighteen years or upwards, and every female not being a married woman, of the age of sixteen years and upwards, of sound mind and memory, and no other, may give and bequeath his or her personal estate by will, in writing” (2 R. S., p. 60, §21); and the statute of wills of 34 and 35 Hen. VIII declares that no will of lands shall be valid if made by any “ idiot, or by any person of non-sane memory.” But competency to execute a testament does not exist, unless the alleged testator has reason and understanding sufficient to comprehend such an act. (Swinburne on Wills, part 2, sec. 4; Marquis of Winchester Case, 6 R., 23 a; Combe's Case, Moore, 759; Herbert v. Lows, 1 Ch., 12, 13; Mountain v. Bennett, 1 Cox, 353.)
*23 In the Marquis of Winchester Case it is said that “ by law it is not sufficient that the testator be of memory, when he makes his will, to answer familiar and usual questions; but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason, and that is such a memory which the law calls-sound and perfect memory.”
In Mountain v. Bennett (1 Cox, 353), the Lord Chief-Baron said: “ Two things must be made out, in the first instance, by those who support the will— the formality of the instrument- and the sanity of the person making it; that if a party impeaching a will relies upon actual force being used upon the testator, it is incumbent on him to show it;” and he adds that “ there is another ground, which, though not so distinct as that of actual force, nor so easy to be proved, yet if it should be made out, would certainly destroy the will,—that is, if a dominion was acquired hy any person „over a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such dominion or influence were acquired over him as to prevent the exercise of such discretion, it would he equally inconsistent with the idea of a disposing mind."
Lord Kenyon, in addressing the jury in Greenwood v. Greenwood (3 Curteis, App., 2), says: “I take it, mind and memory competent to dispose of his property, when it is a little explained, perhaps may stand thus: having that degree of recollection about him that would enable him to look about the property he had to dispose of, and the persons to whom he wishes to dispose of it; if he had the power of summoning up in his mind so as to know what his property was, and who those persons were,' that then were the objects of his bounty, then he was competent to make his will.” <
In Marsh v. Tyrrell (2 Flagg, 122), that experienced and learned judge," Sir John Eicholl, said: “ It is a great but not uncommon error to suppose that, because á person can understand a question put to him, and can give a rational answer to such question, he is of perfect sound mind, and is *24 capable of making a will for any purpose whatever; whereas the rule of law, and it is the rule of common sense, is far otherwise: the competency of the mind must be judged of by the nature of the act to be done, from a consideration of all the circumstances of the case.”
The observations of Erskine, J., in Harwood v. Baker (3 Moore, Priv. C. R., 282-290), a. case not unlike that now under consideration in some of its leading features, are worthy of note. He says: “ But their lordships are of opinion that, in order to constitute a sound disposing mind, a testator must not only be able to understand that he is by his will giving the whole of his property to one object of his regard, but that he must have also capacity to comprehend the extent of his property, and the nature of the claims of others, whom, by his will, he is excluding from all participation in that property ;” and he justly and truthfully adds, “ that the protection of the law is in no cases more needed than it is in those where the mind has become too much enfeebled to comprehend more objects than one, and most especially when that one object may be so forced upon the attention of the invalid as to shut out all others that might require consideration; and therefore the question which their lordships propose to decide in this case is, not whether Mr. Baker knew when he was giving all his property to his wife, and excluding all his other relations from any share in it; but whether he was at that time capable of recollecting who those relations were, oí understanding their respective claims upon his regard and bounty, and of deliberately forming an intelligent purpose of excluding them from any share of his property.”
Mr. Justice Washington, in Harrison v. Rowan (3 Wash. C. C, 385, 836), speaking of the capacity of a testator necessary to a valid will, remarks: “He must, in the language of the law, have a sound and disposing mind and memory. In other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged; a recollection of the property he means to dispose of; of the persons who are the objects of his *25 bounty; and the manner in which it is to be distributed between.them.”
In Den v. Johnson (2 Southard R., 454), the Chief Justice, in charging the jury on this point, said, “ that a disposing mind and memory is a mind and memory which has the capacity of recollecting, discerning, and feeling the relations, connections, and obligations of family and blood; that, though it has been sometimes said, as had been stated, from the books that if one could correctly tell his name, say the day of the week, or even ask for food, it is a sufficient evidence of a disposing mind; yet such sayings, though they show that wills are not lightly to be set aside on suggestions of incapacity, can and ought to have but little weight with rational men, investigating the truth upon their oaths; that if, upon the whole, they should be of opinion that the mental powers of the testatrix were so far enfeebled and broken as that she could not make a discreet disposition of her affairs herself, and the will in question was devised by other persons, and only assentéd to by her, upon being asked, without the power of understanding it, then they ought to find for the plaintiffthat is, that it was not her will.
In Boyd v. Ely (8 Watts’ R.), Sergeant, J., in delivering the opinion of the court, says: “ The great, broad and intelligible question is, whether the mind was restored so as to be sound, whole, compos ; or whether a portion of its thinking and judging powers, as connected with the subject of the will, remained mangled arid perverted at the time of making the codicil, so as to leave it incapable of interfering with his former disposition of his estate, with judgment and discretion.”
In Shropshire v. Reno (5 J. J. Marsh., 91), Robertson, Ch. J., observed that the facts in that case led the court to the opinion: “ That the testator had not a disposing mind, or that if he ever had, it- was not in a disposing state. He was not superannuated, nor was he absolutely stultus or fainus ; but all the facts combined tend to show that he had not a sound memory, nor sufficient mind, nor a mind in a proper state for disposing of his estate with reason, or according to any fixed *26 judgment or settled purpose of his own. This we consider the true test, established not only by philosophy but by law.” Converse v. Converse (21 Verm. R., 168), lays down the rule, that if the testator, when he made the' will, was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the will was composed, and the disposition of his property as therein provided for, both as to the property he meant to dispose of by his will and the persons to whom he meant to convey it, and the manner in which it was to be distributed between them, then he possessed a sound and disposing mind and memory.” This rule was approved by Redfield, J., who added: “ He must undoubtedly retain sufficient active memory to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind á sufficient length of time to perceive at least their obvious relations to 'each other, and be able to form some rational judgment in relation to them.”
In 1828, Chancellor Walworth, in Clarke v. Fisher (1 Paige, 171), said : “ The general principles in relation to the capacity of a person to make a will are well understood. He must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty.” In that case the Chancellor reversed the decision of -the surrogate, which admitted the will of John Fisher to probate. The testamentary capacity of John Fisher was again the subject of a judicial investigation before Vice-Chancellor Sandford, in 1845 and 1846 (3 Sand. Ch. R., 351), and he held that he had testamentary capacity. This decree was reversed, on appeal, by the Chancellor, who held the will void, and this court, on appeal, affirmed the decree of the Chancellor (2 Comst. R., 498). It is stated in a note by the reporter, that a majority of this court were of the opinion, upon all the facts, that the Chancellor had properly set aside the will, but without passing *27 upon the question as to the degree of mental capacity necessary to make a will, affirming the proposition that the testator in that case had not testamentary capacity. Shankland, J., said that, regarding as he did, the cases of Stewart v. Lispenard (26 Wend., 255), and Blanchard v. Nestle (3 Denio, 37), as fixing the standard of testable capacity at any point above that of the idiot and the lunatic, the will cannot be declared void for the want of a sound disposing mind.
The case of Stewart v. Lispenard has challenged much discussion in this State, and has not been regarded with favor by the Bench or the Bar. The circumstances under which it was heard and decided.on the part of the court are such as to carry with it little if any weight of authority. In that case the will of a person conceded to be but a slight remove, in intellectual power, above an idiot, was by a decree of that court, directed to be admitted to probate. The argument of the case was commenced in that court on the 21st of December, 1841, and concluded on the 24th. On .the 31st of that month, the last day of the official term of one-fourth of the Senate, the case came up for decision, and was decided, with little opportunity for an examination of the facts, which the report says were contained in a voluminous case of upwards of 300 pages, and without the benefit of any written opinion, except that of Senator Livingston (and which has since been published), or any suggestions even from the judges of the Supreme Court. The only Justice of that court, being present by courtesy to form a quorum, stating that he had no written opinion to present, not having had leisure since the argument was closed, to digest the facts of the case, or even to read the numerous authorities which had been cited, amounting to nearly or quite a hundred cases, and he declined to deliver an opinion. Senator Verplanck orally stated his reasons for reversal, and thereupon the court, composed exclusively of Senators, by a vote of 12 to 6, reversed the decree of the Chancellor, which affirmed the judgment of the Circuit Judge, who affirmed the decree of the surrogate refusing to admit the will to probate, and the court, by a vote of 11 to 8, made a decree directing the will to be *28 admitted to probate. After the breaking up of the court, the learned opinions of two of the Senators, who voted to reverse, the decree of the three courts below, were published and appear in our reports; but they must be regarded as containing the views of the distinguished Senators and not those of the court. We fully concur in what is said by Mr. Justice Clerks, in Thompson v. Thompson (21 Barb., 116), that “ the opinions of these learned and distinguished Senators in this case are not binding authority.” It is not an inappropriate commentary upon this case to add that subsequent to the decision of the Court of Errors, in an action of ejectment in the Superior Court of Mew York, before Chief Justice Oaklet and a jury, the jury, under instructions from the court, found that this same Alice Lispenard was an idiot, and had no testamentary capacity, thus annulling this same will as to real estate. This verdict was rendered after a protracted investigation, and the examination of a large number of witnesses.
Blanchard v. Nestle (3 Denio, 37) was decided in the Supreme Court in 1846, and affirmed the doctrine of Stewart v. Lispenard, and mainly on the authority of that case, that mere imbecility of mind in a testator, however great, will not avail against his will, provided he be not an idiot or a lunatic.
In Stanton v. Weatherwax (16 Barb., 259) the Supreme Court of the fifth district reversed a judgment of the surrogate, in which he applied to the testator the rule in reference to idiots,and imbeciles, as stated and illustrated in the Lispenard case. The court say that “ perhaps the unsoundness of the testator’s mind extended to so many subjects, and perverted his judgment in relation to so many topics as to obscure and distort his entire mental faculties, and to amount to a general unsoundness of mind, which would entirely incapacitate him from making a rational or valid disposition of his property.”
In Newburn v. Goodwin (17 Barb., 236), Strong, J., thinks the rule established, referring to the Lispenard case, and Blanchard v. Nestle, that-the wills of excessively weak persons, and by those he says he means persons of the lowest *29 degree of mental capacity, where there is a glimmer rather than light, are to be sustained, and he says “ we must submit to it, whatever may be our opinion as to its necessity, propriety, or expediency.”
This court, in two late cases under its consideration (Buel v. McGregor, and in the matter of the will of Richard Ustick*), has not considered this rule of obligatory force upon it, but has been disposed to give the language used in the statute its natural and obvious import and meaning. We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the Statute of W*ills, a person of sound mind and memory, and is competent to dispose of his estate by will.
We aré next to consider upon whom the law casts the burden of establishing the will of a deceased person. The party producing the paper or the proponent of a will makes the allegation that it is the will or the wish of a free and competent testator, and the onus jprobandi is upon the party propounding the *30 alleged testamentary paper. The conscience of the court is to be satisfied by the party setting up the will, that it is the will of a free and capable testator. This clearly recognized rule is well expressed by Parke, B., in delivering the judgment of the Judicial Committee of the Privy Council in Barry v. Bultin (1 Curt., 637; 2 Moore, P. C., 480), where he says: “ The rules of law, according to which cases of this nature are to be decided, do not admit of any dispute, and they have been acquiesced in on both sides. These rules are two: the first, the onus probandi, lies in every case upon the party propounding the will, and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator.” Again: “In all cases, this onus probandi is imposed on the. party propounding a will.” In the late case of Browning v. Budd (6 Moore, P. C., 430) the same learned Judge said: “Their lordships have to apply to the facts of the case the established rule on this subject laid down in Parke v. Ollatt (2 Phil., 323), and fully explained in the case of Barry vs. Bultin (2 Moore, Priv. C., 480), viz., that the burden of proof lies upon the party propounding a will, and that a Court of Probate is not to pronounce in Its favor unless it is judicially satisfied that the instrument propounded is the last will of a free and capable testator.”
In Panton v. Williams (2 Curt., 530, 2 notes of cases, supplement, 21-29), certain papers propounded as the will and codicils of a party deceased, opposed on the grounds of forgery and fraud, were pronounced for by the Prerogative Court, but with great doubt and difficulty. That sentence was reversed by the Judicial Committee of the Privy Council, further evidence having been admitted. Lord Brougham, in delivering the opinion (2 notes of cases, supplement, 29), said: “ It is of itself not immaterial to consider that the contention of those who are setting up those papers is encumbered with so much difficulty; for whether the question arises between a will and an alleged intestacy; or, as in the present case, between one will and another of a prior date, the proof being upon the party, propounding any testamentary writing, the course of adzninis *31 tration directed by the law is to prevail against him who cannot satisfy the conscience of the Court of Probate, that he has established a will, or the prior instrument which is liable to no doubt, is to be established in preference to the posterior one, which cannot be so proved to speak the testator’s intentions, as to leave the court in no doubt that it declares those intentions. There is no duty cast upon the court to strain after pro-late, and to grant it where grave doubts remain wholly unremoved, and great difficulties oppose themselves to our progress, which we are quite unable to surmount.” Again, he says: “ It may suffice to say that the proof eminently lies on him who sets up a will, and further, that it is more fatal than to his adversary if he leaves difficulties entirely without explanations.” He adds : “It is much less material that those who seek to impeach a testamentary instrument should be unable to explain certain things in their case, and should be forced to admit that their argument is not in every point consistent with all the facts, than that they who seek to establish the will should give no rational, consistent, or intelligible solution of those difficulties which encumber their suppositions, and obstruct the path towards the conclusion they would have us arrive at. ... We are of the opinion that grave suspicions rest upon material parts of the case, which it was necessary should be removed, before probate could be given, and that they have not been removed; that the testimony of the witnesses relied upon does not counteract the weight which the undoubted facts of the transaction fling into the other scale— nay, that there is no great difficulty in reconciling much of that testimony, indeed, all its most important portion, with the undisputed facts to which, upon a superficial view, it might seem repugnant.”
In Baker v. Butt (2 Moore, P. C., 317), Parke, B., said: “Ho rule has-been acted upon in the court below which has not been long observed, not only in the Ecclesiastical Courts, but those of common law. . . . For if the party upon whom the burden of the proof of any fact lies, either upon his own case, where there is no conflicting testimony, or upon *32 the balance of evidence, fails to satisfy the tribunal of the truth of the proposition which he has to maintain, he must fail in his suit; and in a court of probate, where the onus probandi most undoubtedly Ees upon the party propounding the will, if the conscience of the Judge, upon a careful and accurate consideration of all the evidence, on both sides, is not judicially satisfied that the paper in question does contain the last will and testament of the deceased, the court is bound to pronounce its opinion, that the instrument is not entitled to probate; and it may frequently happen that this may be the result of an inquiry, in cases of doubtful competency in particular, without the imputation of willful perjury on either side; or it may be the judge may not be satisfied on which side the perjury is committed, or whether it certainly exists.”
The same rule is distinctly recognized and enunciated by the Supreme Court of Massachusetts in Crowningshield v. Crowningshield (2 Gray, 526). It was there held, in accordance with the universal rule, that the burden of proving the sanity of the testator is upon him who offers the will for probate, and this burden does not shift upon evidence of his sanity being given by the subscribing witnesses. Thomas, J., in an able and learned opinion, says: “ When one dies owning real and personal estate, the law fixes its descent and distribu • tion. Under certain conditions, however, it gives to such owner the power to make a disposition of his property, to take effect after his death. This is done by a last will and testáment. To make, such will, certain capacities are requisite in the maker, and certain formalities for its due execution. . . .• When, therefore, a will is offered for probate, to establish it, to entitle it to such probate, it must be shown that the supposed testator had the requisite legal capacities to make the will; to wit, that he was of full age and of sound mind, and that in making it the requisite formalities have been observed. The heirs-at-law rest securely upon the statutes of descent and distributions until some legal act has been done, by which their rights under the statutes have been lost or impaired. . . . Upon whom, then, is the affirmative ? The party offering the *33 will for probate says in effect, This instrument was executed with the requisite formalities, by one of full age and of sound mind,—and he must prove it; and this is to be done, not by showing merely that the testament was in writing, that it bears the signature of the deceased, and that it was attested' in his presence by three witnesses; but also that it was signed by one capable of being a testator, one to whom the law had given the power of making disposition of his property by will.” The learned Judge further adds: “ There are strong reasons why the same presumption as to sanity should not attach to wills as to deeds in ordinary contracts. Wills are supposed to be made in extremis. In point of fact, a large proportion of them are made when the mind is to some extent enfeebled by sickness or old age. It is for this reason that the execution of the will and the proof of its execution are invested with more solemnity, the statute requiring it to be attested by three or more competent witnesses; making void all beneficial devises, legacies or gifts to such interested witnesses, and requiring the presence of the three in probate court for its proof.” In conclusion, he says: “ On the whole matter, we are of opinion •that where a will is offered for probate, the burden of proof in this commonwealth is on the executor or other persons seeking probate, to show that the testator was, at the time of its execution, of sound mind; that if the general presumption of sanity applicable to other contracts is to. be applied to wills, it does not change the burden of proof; that the burden of proof does not shift in the progress of the trial, the issue throughout being one and the same; and that if, upon the whole evidence, it is left uncertain whether the testator was of sound mind or not, then it is left uncertain whether there was under the statute a person capable of making the will, and the will cannot he proved.”

*32
*

*33 We have quoted thus largely from this opinion, for the reason that it is to our mind one of the most able and satis factory upon the points under consideration in this case with which we have met. It is most carefully considered, ably reasoned, and fully sustained by authority. Its results com *34 mand our entire assent. See also Quick v. Mason, 22 Maine, 438; Cilley v. Cilley, 34 id., 162; Wallis v. Hodgson, 2 Atk., 56; Powell on Devises (Jarman’s ed.), p. 81, vol. i.; Newhouse v. Goodwin, supra; Clarke v. Sawyer, supra.
In this connection, it may be well to add a few remarks from the opinion of Mr. Justice Erskine, in the case of Harwood v. Baker, supra. They are in point, and lay down with accuracy the principles which should govern us in the examination of the evidence in this cause. • He says: “ Keeping in mind the principle, that in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in'question does contain the last will and testament of the deceased, and that this obligation is more especially cast • upon him when the evidence in the case shows that the mind of the testator was generally, about the time' of the execution, incompetent to the. exertion required for such a purpose; and further, keeping in mind that the disposition in question was not in accordance with any purpose deliberately formed before his mind -became enfeebled by disease, we come to the examination of the witnesses whose evidence is relied on as proving that at the time of the executing the will in question, he was. fully competent to form, and did deliberately form, the intention of leaving to his wife the whole of his property.”
It seems to us that these cases fully establish the following propositions:
1. That in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does declare the will of the deceased, and that the supposed testator was, at the time of making and publishing the document propounded as his will, of sound and disposing mind and memory.
2. That this burden is not shifted during the progress of the trial, and is not removed by proof of the factum of the will, and the testamentary competency by the attesting witnesses, but remains with the party setting up the will.
3. That if, upon a careful and accurate consideration of all the evidence on both sides, the conscience of the court is not *35 judicially satisfied that the paper in question does contain the last will of the deceased, the court is bound to pronounce its opinion that the instrument is not entitled to probate.
4. That when it is sought to establish a posterior will, to overthrow a prior one made by the testator in health, and under circumstances of deliberation and care, and which is free from all suspicion, and when the subsequent will was made in enfeebled health, and in hostility to the provisions of the first one; in such case the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the Court of Probate that he has established a will. And also the prior wjll is to prevail, unless the subsequent one is so proven to. speak the testator’s intentions, as to leave no doubt that it does so speak them.
5. .That it is not the duty of the court to strain after probate, nor in any case to grant it, where grave doubts remain unre moved, and great difficulties oppose themselves to so doing.
6. That the heirs of a deceased person can rest securely upon the statutes of descents and distributions, and that the rights thus secured to them can only be divested by those claiming under a will and in hostility to them, by showing that the will was executed with the formalities required by law, and by a testator possessing a sound and disposing mind and memory.
The maxim, qui se scripsit hceredem, has imposed by law an additional burden on those claiming to establish a will under circumstances which call for the application of that rule, and the court in such a case justly requires proof of a more clear and satisfactory character. Such a condition is exhibited by the testimony in the present case. The two codicils under consideration were exclusively for the benefit of Mrs. Parish, with the-exception of the charitable gifts,-and although they were not actually written by her, yet they were drawn up at her suggestion, upon her procurement, and by counsel em ployed by her. She prepared and gave the instructions for them, and in judgment of law they must be regarded as written by herself: Facit per alium, facit per se.
*36 The rule which should govern the court in such a case is enunciated in Barry v. Bultin (1 Curt. Eccl. Rep., 637). It is there said, that if a party writés or prepares a will under which he takes a benefit, that it is a circumstance which ought, generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that -the paper propounded does express the true will of the deceased. By the civil law such a will was rendered void, and it may be well doubted whether we have acted wisely in departing from its just and rational provisions in this respect; and it is well said by the court, in Crispell v. Dubois (4 Barb., 398), that, though this rule of the civil law has not been adopted in our courts, yet they do demand satisfactory proof in such cases that the party executing the will clearly understood and freely intended to make that disposition of his property, which the instrument purports to direct. The doctrine is well stated in Parke v. Ollatt (2 Phill., 323), that “ where a person who prepares the instrument and conducts the execution of it, is himself an interested person, propriety and delicacy would infer that he should not conduct the transaction.” In this case, conceding that Mr. Parish had some mind, it must also be conceded that it was greatly enfeebled; and it is undeniable that he was very much in the power of those by whom he was surrounded, unable to communicate except by their aid and through their interpretation, and in answer to questions which they saw fit to make, and by assenting to, or dissenting from, such suggestions as were made to him. Mrs. Parish was for all purposes his only channel of communication, and his sole interpreter, and the only person from whom all suggestions fruitful of results came.; and it follows, conceding she might not have been the actual scrivener, or even not the employer or principal of the scrivener, that the same rule should apply as in cases when the scribé is the chief beneficiary under the will. The reason of this rule would require that these codicils should be fortified and supported to the same *37 extent, and in the same way, as if she had drawn them herself.
Having, as we think, distinctly and satisfactorily ascertained the principles of law which should govern courts in the determination of testamentary cases, and which we have been thus careful to announce as safeguards for the protection of the community, we now proceed to the application of those principles to the testimony in the present case. Such an examination must necessarily in this discussion be confined to its more salient parts. The testimony occupies three octavo volumes, and a brief reference to that portion of it deemed the most significant is all that can be done here.
We shall now regard this court for the purpose of such investigation, as sitting as the primary tribunal, before which the application may be considered as pending, to admit to probate the two codicils in controversy. If it shall be found that the testimony is of such a character that no doubt remains that the two papers propounded express the will of a free and capable testator, then the codicils must be admitted to probate. If, however, the conscience of the court, upon a careful and accurate consideration of all the evidence on both sides, is not judicially satisfied that the papers in question do contain the last will and testament of the deceased, the court is bound to pronounce its opinion that, the instruments are not entitled to probate.
It is impossible, within any reasonable or practicable limits, to review in detail-the mass of testimony taken in the present case.
A very large proportion of it is occupied with the opinions of many highly intelligent and respectable gentlemen, having more or less opportunities for observation of the mental vigor of Mr. Parish after his attack, and their conviction that he understood what was said to him, by signs and gestures, and in some instances by the use, as they understood him, of the monosyllables “yes” and “no,” thereby communicating his thoughts and wishes to those around him. Opinions of witnesses, however respectable, can only have weight and value *38 when accompanied with the facts upon which' they are based, and, having the facts, it is for the jury or the tribunal called upon to scan and consider the testimony, to see if the conclu sions and opinions of the witnesses are sustained by the facts detailed by them. Opinions without facts are of but little im portance. (Clarke v. Sawyer, 3 Sand. Ch., 351; Cilley v. Cilley, supra; De Witt v. Barley, 17 N. Y., 340.)
We shall advert only to such portions of the testimony as have impressed our minds as of peculiar significance, and have led us irresistibly to the conclusions at which we have arrived. Before doing this however, it is well to consider for'a moment the condition in life, the associations, and social position of Mr. Parish previous to the attack in July, 1849. We have a full and minute account of his life from his youth upward. It seems to have been peculiarly blameless and free from reproach. The breath of scandal never tarnished his fair name, and his conduct seems to have been in the highest degree circumspect, and such as became a gentleman of the most fastidious tastes and refined associations. In 1829, occupying then a high social position, and having accumulated a fortune which was then deemed ample and large, he was married to Miss Susan Maria Delafield. She was an accomplished lady, moving in the highest social circles of the city, and of a family distinguished by the intellectual vigor of its members, and by the high professional position of her distinguished brothers. To this circle Mr. Parish was welcomed with cordiality and affection. It is proven in the case that her mother loved him as a son, and her brothers regarded him as a brother. For y twenty years Mr. Parish lived and moved in this circle and with these associations, “ sanspeur et sans reprocheS He gained upon the affections and the respect of his wife’s family, and its members seem to have been his most intimate friends and constant associates; and their friendship and attachment to him were apparently never weakened, but greatly strengthened. His house was the abode of hospitality, and at his table and at his feasts were gathered the most refined, polite, and intellectual of Hew York society. Mr. Kernochan, his *39 life-long associate and intimate friend, his almost daily companion from boyhood until the hour of his death, with better and fuller opportunities of knowing him than any other man, (except perhaps his brother Daniel), and most competent from his intelligence and acquaintance with men to form an accurate and reliable judgment, says of him, “he was the most placid and unexcitable man I ever knew, of great self-respect, and great command of temper.” Dr. Delafield says, “he was of studious courtesy and propriety of demeanor." Col. Diehard Delafield says, “his manners were mild, gentle, and unruffled." Mr. Henry Delafield, who knew him intimately, from residing part of every year in "the same house with him for twenty years, says, “ he was exceedingly affable and courteous.” And Dr. Taylor, the eminent Rector of Grace Church, where Mr. Parish constantly worshiped for more than twenty years, and who was on terms of intimate association with him, says:
“ His conduct was marked most decidedly by great self-respect and strict observance of decorum, and, in his intercourse with others, great courtesy and affability of manner.”. This was the daily walk and carriage, and such the estimate of the gentlemanly bearing of Henry Parish, up to July 19, 1849.
How utterly changed did he become after that day, is conclusively established by the uncontradicted testimony of many witnesses. We shall only advert to a few of the most remarkable and striking incidents, indicating unmistakably the total transmutation, from that day, of his character and habits. The review is painful and would willingly be omitted. In the view we take of this case, it is quite controlling, and it cannot therefore be avoided. The facts narrated show the changed man, and the inferences to be drawn from them are conclusive.
In March, 1850, as related by Dr. Taylor, this scene occur- • red at Mr. Parish’s house after he had administered the Communion to Mr. and Mrs. Parish and their attendant Mary Ann. Green. As Dr. Taylor was going away, Mrs. Parish took out of her pocket three gold pieces of $5 each, and handed them to Mr. Parish to be given by him to Dr. Taylor. Then “ Mr. Parish evinced strong displeasure by his looks and contemptuous *40 mode of expression, frowning, and saying, ‘yah, yah, yah,’ shaking his head at Mrs. Parish, scolding in his way, and refusing to hand ” Dr. Taylor the money. She smiled and said, “give it to the Doctor.” He threw the money back to her, it fell on the floor—she picked it up and gave it to the 'Doctor, and he left.
The interview between Mr. Parish and Mr. Daniel Parish at the house in December, 1850, furnishes another striking illustration of the change in Mk Parish’s manners and character. The testimony clearly shows that the brothers Henry and Daniel had ever lived together on terms of more than ordinary fraternal intimacy. Daniel was the younger brother, and had, . in early life, been taken from home by him, and associated with him in business, and had thus opened up to him his subsequent laudable career. We cannot see that any cloud had ever obscured their friendly regard for each other, and as their natures seem to have been peculiarly undemonstrative, we have but few evidences of outward manifestations of their interest in, or affection for each other, except as we gather them from circumstances. We cannot fail to see, however, underneath a calm and unruffled exterior, a deep current of warm affection for each other, and Henry manifested this feeling towards his brother Daniel on many marked occasions. His sympathy for his brother, at the period of his pecuniary losses, and the delicate and inoffensive way in which Henry contributed from his own means to repair them, may be cited as evidences of his warm feelings for and interest in Daniel and his family. We see no reliable evidence in the case, that any change was ever wrought in Mr. Henry Parish’s mind towards his brother. The trifling incidents referred to as causes for the suggested change of sentiment, are wholly inadequate to produce such a result. It is incontrovertible that Mrs. Parish, for some cause, had certainly not the most friendly feelings towards Mr. Daniel Parish. If she had formed the designs attributed to her, it is not unnatural that she should have desired to exclude Mr. Daniel Parish from the society and house of her husband; that she should have received with *41 distrust and suspicion his every act of omission or commission; and that she should have hoped and expected that her husband would have participated in and sympathized with her in her animosity to Mr. Daniel Parish. It is upon this hypothesis that we may credit the testimony of Quin, that, on the next day after Mr. Parish’s attack, she gave orders to exclude from the house Daniel Parish and the members of his family. That such exclusion did actually take place is uncontradicted. No mention was made as to James Parish, and the reason may be that, as he lived in the country and was partially blind and not in the habit of visiting the city, it was supposed no effort would be made by him to see his'brother, and any attempt to exclude him was uncalled for. It is certain that he did not visit his brother Henry, and whether his failure to do so was prompted by knowledge of the exclusion of his brother Daniel,- and the natural inference that he would also be excluded, or from inability to travel, does not appear. There is no evidence in the case of any expression of dissatisfaction toward him by Mr. Henry Parish on account of such omission, or any exhi bition of unfriendly feeling toward him or his family, if we except the wish said to have been expressed by Mr. Parish, as interpreted by Mrs. Parish to Mr. Lord, that he desired to revoke the legacies to the children of James.
In this place it may be well to remark upon the interviews, and the only ones, had by Mr. Daniel Parish with his brother after his attack. The first one was about the 20th of August, 1849, as near as it can be stated from the testimony; when, on calling at the house to inquire as to the condition of his brother, Quin, the waiter, let him in, having heard the doctor say that his brother was “very low, he was afraid he would do no good.” Quin, thinking he would not live, told Mr. Daniel Parish, in disobedience of his instructions, “to go right up and see his brother now, that when he would call.again he would not see him alive.” Mr. Parish proceeded immediately to his brother’s sick-room, and, as he was about entering, he met Mrs. Parish, who objected to his going in, saying “ he was not in a condition to be seen.” He went in, notwith-. *42 standing, and this first interview of the brothers would seem to have been of the most friendly character on the part of both. A servant was sent into the room to report "to Mrs. Parish what Mr. Daniel Parish was doing there, and he saw him (Daniel) “ having hold of his brother in the bed by his hand.” There is no evidence that Mr. Henry Parish evinced any displeasure at 'this visit. When Mr. Daniel Parish left the house, Mrs. Parish gave instructions to Quin “to be particular not to let him in again.” About the middle of October, 1849, Mr. Parish was very feeble, and Dr. Taylor thought it very probable that he would shortly die. On the 16th Mr. Daniel Parish called to see him, and was admitted by Mrs. Parish, and if he then saw his brother, which- is left by the testimony in some doubt-, this was the second interview. We have no statement of what occurred (if it took place), and only know it was short. This may be well supposed, as it was expected Mr. Parish would not long survive. On the 8th of January following Mr. Henry Parish was driven down to the office, where for many years he and his brother and their partners had transacted business, and then Daniel Parish came up to him, shook hands with him, and said, “ How do you do, Henry?” There is no evidence on this occasion that Mr.' Parish evinced any unfriendly or hostile feeling to his brother Daniel. Between this period and May 1,1850 (from the testimony, the latter part of January), Henry Parish again visited the counting-house in Water street, and met there his brother Daniel. He came forward and shook hands with his brother Henry, and inquired after his health. There is no evidence of any unfriendly feeling exhibited on this occasion by Henry Parish to-his brother. About the last of February, 1850, Henry Parish was severely attacked with a convulsion, and Dr. Delafield,-his physician, deeming his condition alarming, and considering his recovery to be nearly hopeless, it would appear, without consulting Mrs. Parish, despatched a messenger immediately for his brother Daniel. What transpired on the occasion of this visit does not appear. Daniel Parish, on his return from Europe in November or December, 1850, calls *43 on his brother Henry with his two daughters, was kindly received by him, and went with him into the drawing room. While there, Mrs. Parish came in, and soon evinced her displeasure at the presence there of Mr. Daniel Parish, and ordered-him to leave the house. This is the last time Henry and Daniel ever met, and, so far from Henry exhibiting any unkind feeling toward Daniel in any of these interviews, it is shown that he evinced the utmost excitement and anger toward his wife for her apparent harsh and unkind treatment of him on the occasion of this last visit. The case is, therefore, without a scintilla of evidence that Henry Parish, on any occasion, gave expression to any hostility to' his brother Daniel, or of any change of feeling toward him.
We resume the narration-of acts and conduct of Mr. Henry Parish. At the interview at the house in the latter part of" 1850, just referred to, Henry Parish manifestly thought that Mrs. Parish was treating his brother with rudeness and impropriety, if he had mind to comprehend what was transpiring; at any rate, .he' saw something was going on offensive to him; and that Mrs. Parish’s manner to Daniel was unfriendly and harsh. If he could understand what was said, he heard her order his brother to leave her house, and saw her follow him down stairs, as if intending herself to see that he promptly obeyed her commands. At this Henry Parish became greatly excited, and the witness, his attendant" at the time, says: “ Mr. Henry Parish got quite outrageous in my hands. Mr. Parish had his crutch; he raised it with the intention of hitting Mrs. Parish,' who stood in the front hall; just as he raised his crutch, I swung him round from the right side, and got him into the dining-room.” It is not a little extraordinary that, if Henry Parish then entertained toward his brother Daniel the unfriendly and hostile sentiments now alleged, and claimed, and if he heard' and understood all that was transpiring, he should not have sought to inflict chastisement upon that brother whom, on this hypothesis, he must have greatly disliked, if not hated, and who had in his presence insulted his wife, rather *44 than upon her, the advocate and avenger of his wrongs, and the object of contumely on his account.
Again, we have a striking illustration of Mr. Parish’s condition, from the statement of Austin, the poulterer at Washington market. What transpired there is referred to in another connection, and need not be here detailed. Mr. Parish was sent almost daily, with an attendant, to a market in the vicinity of his residence, not, it would appear, for the purpose of making purchases, but to amuse him and occupy his time. He does not seem to have had an intelligent object in going, nor did Mrs. Parish or his attendant, or the persons at the market, pay much heed to what he did or was supposed to communicate. This attendant, in 1850 and 1851, in describing his daily habits, says: “Mr.Parish would take the game and put it to his mouth the same as he did his pants.”
The extraordinary proceedings in the carriage, as detailed by the coachman, Clark, when he threatened the demolition of the carriage windows because he was not taken down town, and the noise and commotion created in the street, and which was quieted by the shallow and successful trick of Clark to deceive him, and make him believe he had been down town, when, in fact, he had only driven him a short distance and back, are quite inharmonious with any thing developed in his character prior to the attack. The melancholy exhibition at Buchanan’s fiower-gardén, as detailed by Clark, shows the changed man, and the forgetfulness of the gentleman, and the habits of the imbecile. His inability to control the calls of nature is a marked and prominent fact in this case, and such inability has ever been regarded as a distinguishing evidence of the loss of mental power. On this occasion such absence of control was peculiarly offensive and improper, and no sense of shame, mortification, or of regret, seems to have been pro duced in him by the occurrence. Mrs. Parish was excited, and 1 found fault with the attendants. They thought to justify themselves by throwing the whole blame on Mr. Parish, and he at length became excited also. Clark says: “He made noises and sounds both, but I disremember what they were. *45 I wasn’t looking him over my shoulder at all, but I heard him . hollowing and bawling.” As an evidence of the total insensibility of Mr. Parish to all the decencies and proprieties of life, a simple reference to his condition of nudity, in rushing into the presence of his wife and seeking her garments for his, and, in this condition, sinking in exhaustion from excitement on the floor, will suffice. He had to be raised from it by Mrs. Parish and the servants. His search for his garments, in the place appropriated for hers, occurred five or six times. (Test., vol. 1, fol. 1509.) The scenes which daily transpired, as detailed by -Clark, one of his attendants, while Mr. Parish occupied the room on the ground-floor, fronting on Seventeenth street, are of the same general character. He says: “In the morning, when I would be dressing (meaning Mr. Parish), he wished to have the windows open, would sign to have the blinds and all open; he would look that way out, and I would say, 1 It is wrong for you to expose yourself against the windows.’ He would say then, ‘Yanne, yanne, yanne,’ raising his hand that it should open, shaking his head; the windows then couldn’t be shut, Mrs. Parish insisting they should be kept shut. Mrs. Parish came several mornings to shut them herself. Mr. Parish would shake his head this way, and would not have it, raising his left hand and moving it toward the windows as if to have them opened, saying, 1 Neay, neay, neay.’ Then Mrs. Parish by-and-by came in again, and drew over the curtains behind Mr. Parish’s back, to keep the people from looking in. Then Mr. Parish by-and-by turns round his head, and sees the curtains drawn, and has them opened again in the same way. Then Mrs. Parish comes and says to him, ‘ Mr. Parish, won’t you keep them shut ?’ he then lifted up his hand and gave Mrs. Parish a drive, saying, ‘ Neay, neay, neay,’ as if to put her away from him.” (Test., vol. 1, fols. 1735-6.) .
On a cold winter’s night the following occurrence took place. The witness says Mr. Parish was sitting in the library with Mr. Delafield and Mrs. Parish. “ He seemed to be very weary and unhappy in his mind, and I was sent for and took him by the arm, and went out into the front hall. He was de *46 .termined apparently to go out, and I told Mrs. Parish ; she came out into the hall with his hat, and put it on his head, and said, if he was going out he had better have his hat on. He raised his left hand and threw his hat right off'his head in the hall, and we went out the front door, and Mrs. Parish closed both doors after us, and shut us out, as it was a very cold winter’s night, and she did not wish to have the doors open. There had been some men working in front of the house dur • ing the daytime, and there was a very large hole about four and a half feet deep or- thereabouts, to the right-hand side of the front door, and that is the very place to which Mr. Parish , wanted to go. I catched hold of Mr. Parish by the collar of the coat, and told him I would not let him go one foot further. He held very much against me; I told .him of the danger we both were in—falling into this hole. It was covered ovei with "boards, and I was standing upon two of them at the time. I got Mr. Parish turned back to the front dóor, and rung the bell, and got Mr. Parish into the library. I then told Mrs. Parish, in the presence of Mr. Delafield, what had happened. I don’t know that there was any answer.” (Test., vol. 1, fols. 1530-2).
One other incident ought not in this connection to be omitted. It is detailed by Mr. Campbell, a witness in no way connected with any of the parties in these causes, and without bias or prejudice of any kind. It is the attempt of Mr.- Parish to climb the' leader in front of his own mansion, facing Hnion Square., It is detailed in vol. 3, fols. 1875-1882. Mr. Parish did not succeed in the enterprise, and but for the interference of Mrs. Parish and his nurse, who forcibly removed him into the house, the consequences to him might have been more serious. This was in 1852. He was compelled to abandon the effort by physical -force, which he struggled in vain to resist.
It cannot be necessary to refer, in this connection, to the numerous eccentricities of Mr. Parish during the period of his mental weakness and obscurity intervening between the date of his attack and his death. Reference need only be made to the many instances when he was guilty of the indecorum and *47 gross rudeness of assaults upon and threats to Mrs. Parish, a lady entitled to, and who had, on all occasions prior to his prostration, received from him the most marked and distinguished courtesy. These incidents are mentioned by Mr. Kernochan, vol. 1, fols. 1040-1043 ; Mr. Folsom, fol. 1152,1153; Simmons, fol. 1702; Wingrove, fol. 1520 ; Dr. Taylor, fol. 3349 ; Clarke, fol. 1736 ; Case, fol. 1894; Brown, vol. 2, fol. 1449; Col. Delafield, fols. 1766-1668 ; Mr. Wiley, fol. 38 ; Henry Delafield, vol. 3, fol. 309.
And can this be the same gentleman of whom Col. Delafield says that, prior to July, 1849, he was mild, gentle, unruffled, yet decided in all matters to which he gave his personal attention? Yol. 2, fol. 1740, Mr. Kernochan, his friend and associate, says of him, in respect to the same period: “ Mr. Parish was certainly a high-minded gentleman, and would never do any act unbecoming a gentleman: he had a great deal of self respect, and great command of temper. I never knew him to do anything under excitement.” (Yol. 1, fol. 1069.) As these two witnesses describe Henry Parish, such, beyond all doubt and controversy, he was anterior to July 19th, 1849; and from the testimony already referred to, we see what the same individual was after that date and up to the period of his death. How entire and complete is the change! How diametrically opposite to the previous conduct of his whole life is that now exhibited! And the inquiry forces itself upon the mind: what cause has produced such results ? Can such totally inconsistent and opposite characters be reconciled with the theory that the faculties, the mind and moral perceptions of Mr. Parish underwent no change, but were the same after July 19th, 1849, as they were before that day ? That after that period his reason was unclouded, and that his intelligence was undimmed ? That he understood all that was said to him, comprehended the relations of things, and was in the full possession of' all his intellectual powers ?
We confess ourselves wholly unable to assent to any such theory. The conviction on our mind is clear that these facts *48 and circumstances show unerringly, that the attack of July 19th obliterated the mental powers, the moral perceptions, the refined and gentle susceptibilities of Henry Parish; that after that period he ceased to be the mild, intelligent and unruffled man he had been theretofore, and that thereafter he was not morally responsible for the' unbecoming and ungentlemanly conduct he so frequently exhibited. He then ceased to be Henry Parish, and was no longer an accountable being.
We find much less difficulty in reconciling our minds to this view of the case than to adopt the theory of the proponents, that Mr. Parish, up to the period of his death, possessed an unclouded intellect, retaining its pristine vigor and activity, was conscious of all that was transpiring around him, and understood all that was said to him; comprehended the minute details of the complicated and important business transacted for seven years in his name, and often in his presence, and was capable of communicating and did communicate his thoughts and wishes to others. It is much easier for us to believe that those who, we doubt not, honestly think that Mr. Parish understood what was said to him, and that they comprehended the operations of his mind and the expression of his wishes, are mistaken in their suppositions, than to reconcile his actions after his attack with the fact that he was still in possession of all his mental faculties.
When the means of arriving at the knowledge whether Mr. Parish was understood or not are examined, it will be found that they were very imperfect, and very liable to misapprehension. It is to be observed also, that all who speak on this subject applied no test to determine the accuracy of their impressions. They saw Mr. Parish mainly when in apparent good physical health, and visited him under the impression and with the preconceived idea that he understood what was said to-him, and they naturally construed the signs and gestures made by him as indications of intelligence, and responsive to suggestions made by them.
But the accustomed mode of conveying thought by speech .was denied to Mr. Parish. Some of the witnesses think he. *49 made use of the words “Yes” aud “No,” and one or two other words; but the weight of the testimony greatly preponderates in favor , of the position that, after his attack, he never uttered an intelligible word. This is the testimony of Mr Kernochan, who saw him more frequently than any person other than members of his family. Mr. John Ward, whose intercourse with him was very frequent, says distinctly that he never heard him utter a distinct and intelligible word after his attack. He was therefore denied the usual manner of communicating his thoughts and wishes. What remained were signs and gestures, and the expressions of his face, to communicate with those around him. Some of the witnesses suppose that they obtained his meaning by the'expression of his face. Now, it is to be remembered, that the only agents conveying such expressions a,re the mouth and eyes. Mr. Parish had no use whatever of the former organ for this purpose. His face was always peculiarly unimpressive and undemonstrative, but after his attacks, the muscles of his mouth became firm and rigid. His eyes afforded but little aid in this particular. He had nearly lost the sight of one of them, and the other was opaque by the operation of cataract, and both were generally covered by spectacles of great convexity. He could, therefore, neither speak nor use the muscles of his face to give expression to his thoughts, and the gestures made by him with the left hand and its fingers were irregular, unmeaning, and contradictory, and often conceded to be misunderstood.
With these imperfect and uncertain media for ascertaining the thoughts of Mr. Parish, it is doing no injustice to any one to assume that they have been mistaken in supposing that they correctly understood him. We more naturally and readily come to this result, because we find that all who had any intercourse with Mr. Parish, on many occasions, found great difficulty in understanding his wishes and thoughts, if they even understood them at all; and the,instances are frequent and clearly established where he often made affirmative and negative motion of his head immediately succeeding each other, to the same question, leaving the inquirer in perplexity which he *50 really intended. The testimony is conclusive that Mrs. Parish herself frequently acknowledged that she could not understand him, and there is some testimony tending to show that on some occasions at least she thought he did not at all understand what was said to him, and that, in her opinion, the effort would be useless to make him understand.
As an illustration: In the interview at the Washington market with Austin, a man well acquainted with Mr. Parish, and who had dealt with him for years, he said to Mrs. Parish, “ I would like to see him (Mr. Parish, who was sitting in the carriage outside the market) — I will take him out something that he will like. I showed her the articles I was going to take out. She told me not to take the canvas-backs, but to take the red-heads, as he could not tell the difference: and woodcock I had; she said they were too high — to carry him some snipe, that would come cheaper. I took them to his carriage, and spoke to him. He looked at me after speaking to him two or three times. I held up in my hand the birds for him, to pick out what he wanted. He took his cane, and flurried it around and scared me. I stepped back from the carriage door. ■ I then stepped up and tried to make him understand me, and I went into the market again. Mrs. Parish bought what she saw fit.” It is not a little difficult to see, if Mr. Parish was in full possession of his mental faculties, why he could not tell the difference between canvas-back ducks and red-heads as well as Mrs. Parish. It is apparent from the testimony that Austin had selected canvas-backs to take out to Mr. Parish, and that, by Mrs. Parish’s direction, they .were changed for the red-heads. Shp must therefore be undoubtedly correct, if the views we entertain of Mr. Parish’s mental condition be sound, in saying that Mr. Parish did not “ understand the difference,” for it is clear from Austin’s testimony that'he did not understand any thing about the object of the visit to the market, or what Austin meant by exhibiting game to him. It would seem, if he understood any thing about it, and had any idea on the subject, he supposed such exhibition was either to ridicule or insult him. When Mr. Parish went through the *51 ceremony of going himself to the market, in the vicinity of his own house, Simmons, his attendant, says, “ The butcher asked me what Mr. Parish wanted. I told the butcher what I heard Mrs. Parish tell the cook, and he would send it home. Wingrove, another attendant, says, “ Mr. Parish would never point to any thing in the store that he wanted.” Mr. Case, the butcher and keeper of the market, says, “ Mr. Parish was brought to the market by his attendant, and he would sit him down in a chair;. he never could tell when he was through; he would sit there till the waiter would take him away. Mrs. Parish told him (Case), that he must not send the articles Mr. Parish had indicated by motions and gestures he wanted, for Mr. Parish did not know what' he wanted.” This witness further said, he “ never could find out rightly what Mr. Parish wanted.”
Numerous other witnesses who have testified in this case, on both sides, say that on many occasions Mr. Parish could not be understood. Mr. Charles A. Davis says, “I have stopped my inquiries endeavoring to find out his meaning; Mrs. Parish failed to find it out.” Folsom, long Mr. Parish’s confidential clerk, says, “ I failed to find out what he wanted.” Wingrove, one of his attendants, says: “ I failed to find out what he wanted, searching for his clothes, nor why he put his clothes and game to his mouth. Neither myself nor Mrs. Parish could find out where he wanted to drive; neither what part of the newspaper he wanted read. That Mrs. Parish often, after making repeated efforts to understand him, gave it up.” Simmons, another of his attendants, says, “ I could not ascertain his wishes from his motions, sounds, or gestures.” James Clark, another attendant, says, “ I and Mrs. Parish would spend an hour or two, and fail to get his meaning.” Dr. Delafield, his physician, gives a long description of his attempts and failures to understand Mr. Parish. Eev. Dr. Taylor, when he proposed first to administer the communion to him, could not understand why he did not wish it done. Mr. Tileston, President of the Phoenix Bank, says, that Mrs. Parish stated to him, on the occasion of the interview between him and Mr. Parish, *52 in her presence, that “ she was entirely unable to convey or understand what Mr. Parish meant.” This was in December, 1853. He adds, that he “ could not understand him in any way.” Dr. Wheaton, a medical man, and intimate friend of Mr. Parish, says, he “ could not interpret at all his meaning, without aid from Mrs. Parish.” Fisher, another of his attendants, says, “ That in August, 1849, Mrs. Parish could not understand him, and Mr. Parish gave up in despair the effort to make her, and was in consequence troubled all day • that she could not find out what he wanted. That he, Fisher, sometimes failed entirely to make out his meaning. Brown, an attendant, tried three days to find out his meaning, and failed many times to do so.- Nichols, the carpenter, could not find out what he wanted done. Mr. Grrinnell could not understand what he meant about investing money. Dr. Markoe, one of his physicians, says, “ Two or three times I failed to get at his meaning, occasionally failed altogether.” He also said, “ Mr. Parish had no power to say he wanted to destroy a will; he had not the power to say any thing; could express no thought except by asking questions,”
All the testimony shows that he could only indicate with his fingers and hand, or by sounds, that he wanted something, or that something was the matter, and which motions or sounds were construed by those around him as evidences of his wish to put a question, whereupon they began to suggest various topics, and when they thought they perceived that they had hit upon the subject in his mind they supposed he wished to inquire about, they put such questions as suggested themselves to them, and to which they supposed they had received affirmative or negative answers. If Mr. Parish had no power to express a wish to destroy a will, it follows he had none to create one, and the manifestation of his wishes depended entirely upon the interpreter, and the integrity of the interpretation.
Henry Delafield, who occupied the house with him, says, that as to ordinary affairs, he frequently failed to ascertain his meaning. Jones, the tailor, could not understand what he *53 wanted as to his clothes, even with Mrs. Parish’s aid. She could not understand him; he nodded his head, and immediately after changed to the shake of it. Mr. Gasquet, his old friend and partner, could not understand at all what he meant. Mr. Ogden, the Cashier of the Phoenix Bank, where Mr. Parish for years had been a director, and who knew him well, in an interview at the Bank with Mr. Parish, ih Mrs. Parish’s presence, said to her, “ Mrs. Parish. I cannot understand him.” He understood nothing from his motions; “ they were unmeaning.” This was in October, 1849. John Ward, long an intimate acquaintance, and with whom Mr. Parish transacted a large amount of business in Mrs. Parish’s presence, from the period of his attack until his death, says, that he addressed himself generally to Mr. Parish, but he does not remember that Mr. Parish ever made any answer by sign or motion, until Mrs. Parish had spoken to him; and he emphatically says, that in all his negotiations with Mr. and Mrs. Parish, to the best of his recollection, he “never heard.Mr. Parish utter a word after his attack." Mr. Parish’s faithful and true friend, Mr. Kernochan, and who was almost his daily visitor during this long period of his affliction, in answer to the question, “ Did you ever understand or attach any meaning to .the motions of his hands, or the sounds accompanying them ?” says, “ I certainly never understood them; I attached no definite meaning to them of my own observation. There was never any distinct articulation in any case, not even of a single word.”
It is thus seen that great difficulties and uncertainty, to say the least of it, attended any expression of the thoughts or wishes of Mr. Parish, and that a large number of those having business or intercourse with him, utterly failed to attach or obtain any meaning to his signs, sounds, motions, or gestures. The natural and obvious deductions to be made from •all these facts and circumstances are, that Mr. Parish had no ideas to communicate, or if he had any, that the means of doing so, with certainty and beyond all cavil or doubt, were denied to him. If some, with the aid of an interpreter, and always the same, indulged the charitable thought that they correctly *54 apprehended his wishes, it is clear that others, equally intelligent, with adequate and equal opportunities of judging, and with the same aids, utterly failed to comprehend him.'
The facts testified to are of such a character, giving full and proper weight to all the evidence, regarding it in the most favorable light to the proponents, as to leave great doubt on the mind that Mr. Parish, after his attack, was any thing more than the creature of habit, the reflex of the opinions and wishes of others, the clay in the hands of the potter, to be moulded into any shape or form desired. His hearing was good; the sight of one of his eyes, although impaired, was not seriously affected, and he had the perfect use of his left hand and arm. Nothing was more natural, therefore, than that those who entertained the idea that he possessed intellect, would resort to the obvious facilities and aids to enable him" to give it expression. The power of speech, it is manifest, was denied to him; if he possessed any, it was exercised most imperfectly, and with no practical advantage. This, the obvious and usual method of communicating thought, he had not. None could fail to know that, if Mr. Parish had thoughts, the great and controlling anxiety of his life would be to give them expression, and to manifest them" to his friends. Independently of the social gratification attendant upon such successful effort, he had great interests to manage, a large property to look after, and the accumulation and management of which had been the absorbing object of his life. A large estate had accumulated and was accumulating, which, if he knew any thing, he must have .known was taking a direction, as the proponents allege, hostile to his wishes, to those from whom he was alienated, and away from the cherished objects of his regard and affections. Every conceivable motive and consideration pressed upon him, therefore, to keep up intercourse with his family and friends, if the thing was possible. No man having the power thus to communicate, and having thoughts and wishes to express, thus circumstanced, would remain in a living grave for seven years, without making superhuman efforts to be understood by those around him. Those friends rightly assumed, *55 therefore, that Mr. Parish would be most solicitous to-maintain intercourse with them, if it were possible so to do. The first attempt, and the most obvious one, was to have Mr. Parish write with his left hand. He had the perfect use of it; could write well; had done it all his life. We all know from experience how simple this process is, and how easy of execution. We can see how effectual it would have been in enabling Mr. Parish to express his wishes, and keep up his intercourse with his friends, and retain the management and control óf his affairs, and make such disposition of his estate as he then desired. This expedient, though effectually tried and persistently urged upon Mr. Parish, utterly failed of accomplishing any satisfactory result. One of the witnesses thinks that, on one occasion, he succeeded in' writing the word “ horse,” and the same witness says he wrote several times the word “ wills.” The latter efforts were preserved, and are produced and made exhibits in the cause. An inspection of them will show that there is no propriety in interpreting them as “ wills,” or any other word. They are nothing but imperfect, unmeaning scrawls, such as any child might make who had strength to hold a pen. They unmistakably show that there was no mind to guide the hand, or, if there was any, not of sufficient force to control the will, and second its determinations. If Mr. Parish had any mind capable of operation and of forming conclusions, his faculty of hearing remaining unimpaired, it would have been the easiest thing imaginable for him to have written the word “ Yes ” in response to any question he desired to answer in the affirmative, and the word “ Ho ” to any he desired to answer in the negative. This could have been done with much less effort than was required to write the words “ horse” and “ wills.”
This attempt to have Mr. Parish communicate by writing having proved fruitless, resort was had to block letters, a very simple and facile mode of communicating thought by those who are deprived of the natural use of doing so by speech. H he had any thoughts to communicate, he had thus at hand an easy, certain, and effective means of doing so with accu *56 racy and beyond the peradventure of mistake. The slightest exertion only was required—no fatigue could ensue. This attempt also produced no results. Another effort was also made with the letters of the alphabet in another form, and it also was unsuccessful.
A further and different mode was suggested by some of his friends, which, if the theory of some of the witnesses for the proponents is correct, afforded a safe, sure, and easy method of communication. It was the use of a dictionary by Mr. Parish. This process had two advantages: it would have enabled him to suggest topics of inquiry, and insured intelligent and certain answers to the questions put to him. A moment’s reflection will satisfy any mind that no process could have been devised, more certain and satisfactory than this, for holding intercourse with an intelligent mind, denied to it the power of giving expression to its emotions and thoughts in the form of speech. Mo results were obtained from this source, and the inference from the testimony is that no efforts were made to afford Mr. Parish the opportunity of trying this method of communicating his thoughts.
And this omission greatly strengthens the impression conveyed by the testimony, that he did not and could not read at all after his attack. It is true that he was seen to look at newspapers, accounts, ledgers, check-books, notes, &c., but that his mind took in and comprehended what his visual organs discerned, the evidence in this case will not warrant us in assuming. It is natural to suppose that, if Mr. Parish could read, he would have desired .himself to peruse these codicils, and they would have been placed before him for that purpose; and, on the assumption that he could, the inquiry presses upon us, Why were they not given to him for perusal ? If it had been established that he could read intelligently, find it had appeared that these codicils had been read over by him, it would have furnished much more satisfactory evidence than any we now have, that they expressed his wishes. If he could read, and had intellect to understand what his eyes beheld, why is it that there is an entire absence of evidence that he was ever *57 seen reading, with apparent understanding, a letter? of his ever having been seen, on any one occasion during his long confinement, with a book in his hand perusing it? Is it to be believed that, if Mr. Parish could read, and had a mind to comprehend what he read, that he would not, during these whole seven years, when he was almost entirely excluded from intercourse with the world, have once resorted to books for amusement and instruction? It is incredible. We all know that no greater solace is available to an invalid, and none more universally sought after. They are companions always at hand, of the most soothing, agreeable, and entertaining character; and it cannot be doubted that, if Mr. Parish could read, and had intellectual capacity sufficient to under■stand what he read, that books would have been his daily and constant companions.
These views press themselves on us with great force, if we concur in the opinion of Dr. Taylor that Mr. Parish, after his attack, became a devout and sincere Christian, and was anxiously and inquiringly seeking to make his peace with his Maker, whom he must have expected soon to meet. • Where would an intelligent Christian sooner turn for advice, direction and consolation, than to the Bible ? This book, we all know, is printed in type so that all, of any degree of vision, can peruse it. May, those totally deprived of sight are not precluded from resorting to it for comfort and direction. We have looked in vain through the testimony in this case to find any evidence that Mr. Parish ever read his Bible, that one was ever procured for him, or that any effort was ever made to induce him to peruse it, or that he ever indicated a wish to do so.
To what result does this review of the facts and circumstances in this case, adverted to and commented on, lead the mind ? On a careful consideration of them all, with a most anxious desire to arrive at a just and correct conclusion, we are clearly of the opinion that the attack of Mr. Parish on the 19th of July, 1849, extinguished his intellectual powers, so obliterated and blotted out his mental faculties, that after that period he was not a man of sound mind and memory within *58 the meaning and language of the statutes, and was therefore incompetent to make a will, and that the codicils of September, 1853, and of June, 1854, were not Ms will, and formed no part thereof.
We have endeavored to give just and due weight to the arguments and suggestions so eloquently and ably urged upon our consideration by the counsel for the proponents. Neither are we unmindful that, in coming to this conclusion, we differ with many witnesses of intelligence, who have expressed the opinion under oath that Mr. Parish, at the time he executed these codicils, understood their import and effect. With the highest respect for those gentlemen, our duty calls upon us to consider all the facts presented by the testimony, to scan and weigh their testimony as well as that of the other witnesses in ■ the cause, and, after a careful and accurate examination of the testimony on both sides, to say whether the papers propounded should be admitted to probate. We have a clear conviction, and one which we have arrived at without hesitancy of doubt, that they ought not. We think that, in a case presenting so many obstacles on the part of the proponents, and which, we are compelled to say, have not been removed, the surrogate decided correctly in refusing to admit these codicils to probate. . .
We are impressed with the soundness of the rules of law, before adverted to, that it is much less material that those who seek to impeach a testamentary instrument, should not be able to explain certain things in their case, should be forced to admit that their argument is not in every part consistent with all the facts, than that they who seek to establish the will, should give no rational, consistent, or intelligible solution of those difficulties which encumber their suppositions, and obstruct the path towards the conclusion they would have us arrive at; that it is not the duty of the court to strain after probate, and especially to seek to establish a posterior will, made in conceded enfeebled health, unsustained by previous declarations of intention, over a prior will made in health,- and with care and deliberation, when the provisions of the posterior will are *59 in direct hostility and conflict with those of the prior one; that heirs and distributees may rest securely upon the statutes of descent and distributions, and that, their rights are not to be taken from them unless by an instrument executed in con formity with the formalities prescribed by statute, and by a person authorized by it to make and execute such instrument; that it would be in violation of long and well-established principles, and an almost uniform and unbroken current .of decision in England and in this country, to admit to probate testamentary papers, prepared and executed under the circumstances these were, by a man who was in apparent full physical health, and possessing nearly his natural strength, who could not or would not write, who could not or would not speak, who could not or would not use the letters of the alphabet, or even a dictionary, for the purpose of conveying his wishes, upon proof solely that they were supposed to express the testator’s wishes, from signs, gestures, and motions made by him, and especially when it appeared that such signs, gestures, and motions were often contradictory, uncertain, frequently misunderstood, and often not comprehended at all.
It is not to be forgotten that, during the whole period intervening between the attack of Mr. Parish and his death, there is no evidence that he, by himself, ever performed a single business transaction, ever made a purchase or sale of property, or ever expended a single dollar, or was ever entrusted with one, although the owner of a million. These facts are instructive, as showing that he was treated and regarded by those around him as non ‘compos, and his condition undoubtedly was that of utter, certain, and absolute dementia. .
If, however, these views are stronger than the facts will warrant, there is another proposition which is undeniable, and that is, if, on due consideration of all the testimony and the arguments, the mind of the court is in equilibrio, then the proposed codicils must be pronounced against. In the present case, as already observed, there is a will free from all question and all controversy. It was made by the testator after peculiar deliberation, and certainly disposes of his property not *60 unnaturally or inequitably. No change in the circumstances of the testator’s family having occurred, and a condition of bodily and mental weakness having supervened, certainly well calculated to create grave doubts of the testator’s soundness of mind, codicils are produced, claimed to be his last will and testament, revoking previous dispositions, and giving an entirely different direction to the great bulk of his estate, without any apparent or assigned cause. The language of Lord Brougham in Panton v. Williams (supra), is apposite and may well be followed:
“ That when the question arises between one will and another of a prior date, the proof being upon the party propounding any testamentary writing, the course of administration directed by law is to prevail against him who cannot satisfy the Court of Probate that he has established a will; or the prior instrument which is liable to no doubt is to be established in preference to the posterior one which cannot be proved to speak the testator’s intentions so as to leave the court in no doubt that it declares those intentions."
The argument has been much pressed upon us, that the concentration of the great mass of the testator’s estate in Mrs. Parish is supported by several collateral circumstances, and that therefore the court should be less exacting in the quantum of proof to sustain such bequests, than it would demand when they were not thus supported. It is said that it might well be supposed that the testator would desire to keep up and have maintained his family establishment the same after his death as before. The answer to that argument is, that he had made most abundant provision for this in his will of 1842, by leaving to Mrs. Parish an income of about $23,000 annually, while the current expenses of both in his lifetime had never exceeded $10,000. He had, therefore, provided for her singly more than double the amount required annually for both.
It is also urged that the alienation of his feeling towards his brother Daniel afforded a sufficient reason for revoking his appointment as executor, and the legacy to him of $10,000, *61 and the revocation of the residuary clause in the will of 1842 in favor of his brothers Daniel and James, and that this alienation is confirmed by the efforts made by him on two several and distinct occasions to annul the -legacies to his unoffending nieces and nephews, the children of those brothers. It is believed that it has already been conclusively shown that there is no evidence in the. case, tending to show any such alienation of affection on the part of Mr. Parish towards his brother Daniel, but on the contrary, it distinctly appears that in all the interviews between them after his attack, no evidences of such alienation were exhibited, but every thing was in harmony with their previous relations. But if it were so as to Daniel Parish, the cause assigned is wholly inadequate, for any such unfriendly feelings towards James Parish, as to withdraw from him or his children, or those of Daniel even, what had been secured to them with so much care and deliberation and natural propriety.
It is also claimed that it is manifest, from the framework of the original will, that the testator did not intend that his brothers should have any considerable portion of his estate. This argument has in part already been answered, and, in addition, it may be observed that the peculiar and careful language of the will is such that it conveyed to the residuary devisees all 'the property, real and personal, of the testator which he might own or be possessed of at the time of his death, not specifically given or disposed of by the will. He had disposed of $331,000 to his wife. This was absolutely hers, or subject to her disposal. He had specifically given property amounting to $60,000 to three young gentlemen, kinsmen and friends, and legacies in the aggregate to $290,000. On his return from Europe in 1844, having ascertained that two of the legatees, whose legacies amounted to $20,000, -children of his brother James, had died, he called on Mr. Havens, the counsel who prepared his will, to ascertain among other things, what effect their deaths would have upon its provisions. It is not to be forgotten that Mr. Parish always kept a duplicate of his will with him, and it is not to be doubted that it was often *62 referred to and its contents the subject of his frequent meditations. Mr. Havens correctly informed him that the death of any of the legatees in his lifetime, under age or without issue or an appointment, would lapse the legacies, and that they would then fall into the residuum of the estate, and pass to the residuary devisees. With this he was satisfied: Two other children of his brother James died before his attack, whereby the residuary fund was increased $40,000, and by reason of ' the reduction in the estimated value of his property made by the testator himself on the first of July, 1849, the apparent increase in his estate since 1842 had only been $165,857. Its real increase was in fact much more, as the Union Place property had cost him $112,000, and was actually then worth that, or more, but was estimated by him at only $60,000. On the first of July, 1849, the testator saw that his brothers would take under the will, the amount as estimated value of the residue,
In 1842, .-........................... $36,879
Lapsed legacies, ...................... 40,000
Increase of estate,..................... 165,857
Under-estimate of Union Place house,.... 52,000
• Total,....................... $294,736
which would be nearly $150,000 to each, and which might be enhanced, and obviously would be by other legacies falling in, and the natural increase of his estate. With these results clearly before him, he made no change in the framework of his will.
It is also urged that the codicils made by Mr. Parish after his attack were made to evince to Mrs. Parish his increased affection for her, and his grateful appreciation of her kind and assiduous attentions to him during his protracted illness. This, argument has, we think, no force whatever, so far as it presents an inducement for the execution of the first codicil. That was prepared and signed within a few days after returning consciousness from the blow of July 19, and in regard to the other two codicils, the testimony does not contain any indications of an increase of affection on'-the part of Mr. Parish for *63 his wife after his attack. On the contrary, if he was a conscious and responsible man, the inference would be that the affections of the husband had been much weakened, that he evinced no tender or growing regard for her, and had no grateful appreciation of her watchfulness and care of -him. On the theory of his intelligence and testamentary capacity, his treatment of her was strange and unaccountable, and would lead us to expect that he would have sought to have, reduced the provision which he once thought ample and munificent for her, rather than devolve upon her nearly the whole of his estate to the entire disherison of all those of his own blood, some of whom had the strongest claims upon his bounty and his affections.
Much stress also is laid upon the circumstances testified to by Mr. Ward in reference to the purchase of notes by Mr. and Mrs. Parish, and one inference is drawn, that in purchasing the notes Mr. Parish relied upon his own knowledge of the mercantile standing of the makers, and that the same was made upon his judgment solely. Mr. Ward’s testimony will hardly bear that construction, and a moment’s reflection will make it obvious that if Mr. Parish purchased notes upon the information he possessed of the mercantile standing of the makers, he must have done it very-blindly. He had been excluded for years from intercourse with the mercantile world, and would necessarily know, if he knew any thing, but little of the changes and losses of business houses. We have too many instances of firms, having wealth and unbounded credit one week, plunged into hopeless insolvency the next, to place much reliance on the judgment formed on knowledge obtained in and previous to 1849, as to the responsibility of firms in 1854 and 1855. .It is more simple a*nd easy to determine the value of the securities of a corporation whose resources and property were matters of public notoriety, than the means of private individuals. Here, real and apparent are far from being the same. A careful examination of Mr. Ward’s testimony will leave the impression that Mr. Parish never, except perhaps on two occasions, and then by nods of assent, made any answer *64 to any suggestions from Mr. Ward until Mrs. Parish had spoken. It has been shown that very little reliance could be placed on Mr. Parish’s motions of assent or dissent. There is nothing in the case to show that Mrs. Parish would have permitted important purchases to be made predicated upon them, ■unless she had been satisfied of their wisdom and propriety. In fact, it is incontrovertible that she placed no confidence in the manifestations of his wishes and opinions in trivial matters, and so frequently stated, and it is impossible, with this evidence before us, to believe that she acted upon any indications made by him in matters involving the disposition and safety of thousands of dollars.
We have not thought it necessary to discuss the learned and able medical opinions furnished on both sides to the court, for its perusal and consideration. We do not understand that the parties have agreed that they should be regarded as testimony in the case with the same effect as though the writers had been examined as witnesses. They are valuable disquisitions upon the subject treated, and evince the highest grade of professional talent and knowledge. While they have been instructive to the court, they cannot strictly be regarded as evidence in chief in the cause. Opinions, however respectable, and coming even from the most intelligent minds, are not the sources from which the judicial mind seeks enlightenment. The law, for wise purposes, has precluded it from relying on facts not communicated under the solemnity of an oath, and it is the duty of every tribunal called upon to pass on a question of fact, to confine its investigations to such facts as are verified in a legal manner. If it then fails in arriving at the truth, it will have done its whole duty, and the result must be 'attributed to the imperfections of our judicial system, and the inadequate tests which the mind is capable of applying to discover it. We.have not, therefore, considered as evidence the mere opinions of these medical gentlemen, and we have accordingly examined their disquisitions in the same manner, and for the same object, that we would examine any medical treatises on the same subject. Their value consists mainly in the arguments and reasons they *65 contain, as applicable to the facts developed in the present case, and we have so regarded them. They have been to us "sources of great instruction, and are valuable contributions to the study of medical jurisprudence, and exhaust the-med&o legal aspects of the intricate diseases of the brain arising from apoplexy, paralysis, and epilepsy.
In the consideration of cases like the present, in reviewing the findings of the surrogate on questions of fact, as well as his conclusions of law, we regard the matter as res nova with us. It is true we have not the -living witnesses before us, but we have their testimony, taken with all the safeguards which the law affords, and we have all the facilities of arriving at the-truth which the Court of Chancery or the ecclesiastical courts ever had. It certainly affords us gratification, then, on the careful examination of all the testimony in the case, aided by an extended discussion by able and learned counsel, and the mature consideration which has been given to the case, to have arrived at the same conclusion as that of the learned and intelligent surrogate who heard it in the first instance, and whose decision was affirmed by the Supreme Court. In the examination of the peculiar features of the present controversy we have also been assisted and gratified by the profound and elaborate preparation, as well as by the learned and interesting discussions of the eminent counsel who have addressed the court. It is one of those cases in reference to which Mr. Justice Ebskine wisely and justly said, “ that the protection of the law is in no cases more needed than it is in those where the mind has been too much enfeebled to comprehend more objects than one, and most especially where that one object may be so forced upon the attention of the invalid as to shut out all others that might require consideration.” These views lead to the establishment of the will of 1842, unaffected by and in nowise impaired by the codicils of September, 1853, and June, 1854.
• We are of the opinion that the judgments in each of the two above-entitled causes should be affirmed without cost to either party in the first, but with costs in the second cause.
*66 We are of opinion that it was the duty of the executors to prosecute the question on these codicils to a final determination in the court of last resort; and we presume that, in the settlement of their accounts before the surrogate, they will be allowed the costs of litigation.
Denio, Weight, Allen and Smith, Js., concurred in this conclusion. They also gave, a general assent to the opinion,, which is subject to such qualification as may follow from their assent to certain legal propositions asserted by Gould, J., which are noted at the end of his opinion. Denio, J., did not concur in the disapproval of the decision of Stewart v. Lispenard, so far as relates to the law as enunciated in that case, but agreed with the observations of Gould, J., on that subject. .

 The Reporter does not understand either of those cases as professedly impeaching the law of Stewart v. Lispenard, or as being regarded by the judges who delivered the opinions in them respectively as settling any point of law whatever. They turned upon mere questions of fact; and such cases have not heretofore been regarded, either by the court or the Reporters, as of such service to the profession as to justify their publication. The opinion in Buel v. McGregor was prepared by Denio, J., who, as is apparent from the present case, did not intend to overrule the law of Stewart v. Lispenard!, whatever he might think of its application in that particular case.